The complainant, by its bill, prays that a policy of life and health insurance issued by it to the defendant Harry C. Holmes in which the defendant Katherine Holmes is designated as beneficiary, be surrendered up and canceled because, *Page 116 
as alleged, it was obtained by fraud. The proofs show that on May 19th, 1930, the defendant Harry C. Holmes made written application to complainant for a policy of insurance on his life and health, and in and by said application declared that all the statements and answers to the questions therein mentioned were complete and true, and that the questions, answers and statements contained in said application, together with his declaration with respect thereto, as well as the statements and answers made or thereafter to be made to the complainant's medical examiner, should constitute the application and become a part of the contract of insurance applied for by him. He therein further agreed that the policy of insurance applied for should be accepted by him subject to the privileges and provisions therein contained, and that unless the full first premium was paid by him at the time of making the application the policy of insurance therein applied for should not take effect until issued by the complainant and received by him and the full first premium thereon paid, while his health, habits and occupation were the same as described in said application. On May 22d 1930, said defendant declared and stated to complainant's medical examiner that all the statements and answers to the questions contained in such part of the aforesaid application known as "declarations made to the medical examiner" were complete and true, and that said questions, answers and statements should form part of the contract of insurance applied for. Said defendant further stated in said application that he had never had medical or surgical treatment in a hospital or sanitarium, that he was then in good health, and he had not within three years preceding said application been attended by a physician, and that he never had any of the diseases mentioned in question ten of said application, among which were listed — consumption, appendicitis, dyspepsia. The proofs herein disclose that the policy of insurance when issued by the complainant was brought to him by complainant's agent who had solicited the application for the policy, and said agent, at said defendant's request, left the policy with said defendant in order that he might read same. It is clearly *Page 117 
apparent from the proofs herein that said defendant was able to read the policy and understand the contents thereof, together with the contents of the photostatic copy of the application for the policy which was attached to and made part of said policy. Several days thereafter the policy was returned to complainant's agent by said defendant who expressed his disinclination to accept same. On August 5th, 1930, the complainant's agent redelivered said policy to said defendant, whereupon defendant then accepted same and made payment of the first premium payable thereon. It thus appears that the policy of insurance became effective from and after August 5th, 1930, the date of the delivery thereof, and payment of premium thereon, notwithstanding said policy was dated May 27th, 1930. The proofs herein show that said defendant had been ill, and had consulted with and had been attended by physicians and surgeons on numerous occasions and for various ills prior to August 5th, 1930, and also prior to May 27th, 1930; also that he had been X-rayed a number of times by roentgenologists. Several weeks before he signed the application for insurance he was examined by Dr. Dwyer who directed him to go to Dr. Roemer for an X-ray. The X-ray was taken by Dr. Roemer on April 28th, 1930, and the X-ray film showed that he was suffering from chronic psoasis (which was mentioned herein as chronic constipation), and chronic appendicitis. When asked how many times prior to April 28th, 1930, he had seen Dr. Dwyer in the preceding two or three years, he replied: "Why, I used to run to the doctor's office at least every six months to have him look me over physically." He was then asked, "did he ever give you any medicine during that period?" and he replied, "I believe he did: yes." He was then asked, "you were somewhat worried about your physical condition, weren't you?" and he replied, "I was always worrying about my physical condition." On August 4th, 1930, Dr. Roemer X-rayed said defendant's spine and thus found him suffering from tuberculosis of the spine, commonly known as Potts' disease, and reported thereon to Dr. Morrill on August 5th. The report reads: "The first lumbar vertebrae showed a marked obstruction *Page 118 
and vacuotization, due undoubtedly to a tubercular affection." The proofs show that said defendant for a considerable period of time prior to August 5th, 1930, had been under the care and treatment of physicians for colitis, dyspepsia, chronic appendicitis and chronic psoasis. It appears that Dr. Dwyer attended said defendant for colitis in 1923. Dr. Dwyer testified that when said defendant visited him on April 28th, 1930, he complained of pain in his abdomen, and the doctor examined him and thinking he might have had a recurrence of the condition of colitis for which he had treated him had him X-rayed again, but the X-ray was negative as to the condition of colitis. Dr. Dwyer testified that around the end of July or the 1st of August, 1930, the defendant Holmes visited him and he then examined the said defendant and diagnosed his ailment as tuberculosis of the spine and referred him to Dr. Morrill for examination and verification of his diagnosis. He says Dr. Morrill reported to him the first part of August that he was in doubt. Dr. Dwyer testified — "this boy gave a history of an early injury to the spine, eighteen or twenty years ago, and after thinking the thing over, and conferring about it, Dr. Morrill and I both agreed to send him to the hospital. He went to the hospital and was X-rayed, and Dr. Golde, who took the X-ray, said it was tuberculosis of the spine. That this condition of the spine was an aftermath of his injury as a youngster." Mr. Holmes himself testified that before he signed the application for insurance he had been informed by his physician that he had inflammation of the colon and chronic appendicitis. Dr. Perlberg, a roentgenologist, testified that the Potts' disease from which said defendant suffered was a condition of at least several months' duration prior to August 5th, 1930, the date of the application for the policy of insurance. The testimony of the defendant himself evidences that he was not in "good health" for a considerable period of time prior to making application to complainant for the policy of insurance in question, and that he was aware thereof. The proofs show that said defendant became incapacitated from engaging in gainful work on August 15th, 1930, and that he has continued *Page 119 
to be incapacitated ever since said time. The disability claim papers filed by defendant Holmes with complainant on November 20th, 1930, comprise four exhibits. Such exhibits manifest that said defendant made claim that he became totally and permanently disabled on August 15th, 1930. In his proof of claim he states that he first consulted a physician for his then present illness on August 1st, 1930. Part of the proofs of claim for disability are made up by a statement signed by Dr. Dwyer (Exhibit C-2b) wherein the doctor states that the defendant first consulted him for disability on August 1st, 1930. Dr. Morrill, in ExhibitC-2a, stated that said defendant first consulted him for his illness on August 1st, 1930, but in his oral testimony herein stated that he was mistaken in having stated in the claim papers that the defendant Holmes first consulted him for illness on August 1st, 1930, and that the fact was that he first treated him on August 8th, 1930. Dr. Morrill testified he first informed the defendant Holmes of the nature of his Potts' disease on August 7th, 1930, and that part of the records of his office confirmed him in so stating. It appears, therefore, that the statement in writing differs materially from the oral statement of Dr. Morrill. Dr. Roemer stated "the examination was made on the 4th. I suppose the films were delivered on the 5th — the following day." When Dr. Morrill was asked, "how did you come to make the misstatement?" he replied, "I don't know, sir. I examined the records carefully. The first day I saw Mr. Holmes was the 7th of August, 1930, and treated him on the 8th of August, 1930. There must have been a careless error. That's all I can say." And when asked from what day Holmes had been disabled Dr. Morrill replied, "I treated him on the 7th of August, and he has been disabled since the 14th day of August, 1930; this was the evening he collapsed on the sidewalk." Upon the defendant Holmes being asked when Potts' disease first manifested itself to him he replied, "to my knowledge on August 14th, when I collapsed. I came to work that day, got out of the car, fell in a heap and have been here since."
What I have set out hereinabove of the testimony in the *Page 120 
case sub judice manifests that the defendant Holmes misrepresented facts as to his physical condition when he applied to complainant for the policy of insurance in question; and that he knowingly misrepresented facts as to his condition of health and as to prior treatments by and attendances upon physicians and attendance at a hospital. The representations which he made that he was in "good health," that he had never been attended by physicians and that he had never been in a hospital, were false and known by him so to be. It may be regarded as doubtful from the proofs herein as to whether he was aware prior to August 5th, 1930, that he was suffering from Potts' disease, but there is testimony herein that he was advised prior to August 5th, 1930, that he was suffering therefrom. In Kerpchak v. John HancockMutual Life Insurance Co., 97 N.J. Law 196, it was held that where a policy provides, as required by law, that "all statements made by the insured shall, in the absence of fraud, be deemed representations and not warrantees," the policy will be avoided for a misrepresentation in the application made a part thereof, if the misrepresentation be material and fraudulent; that is to say, if it be the statement of something as a fact, which is untrue, and which the insured stated, knowing it to be untrue, and with an intent to deceive, or which he stated positively as true, without knowing it to be true, and which has a tendency to mislead; such fact in either case being material to the risk. The court also held, "every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium," and "a false statement in the application made a part of the contract that the applicant had not consulted or been attended or treated by a physician, is material to the risk, and, if made knowingly and willfully, will avoid the policy." See, also, Prahm v. Prudential InsuranceCo., 97 N.J. Law 206, and Locker v. Metropolitan LifeInsurance Co., 107 N.J. Law 257. A court of equity will relieve from false representations whether they *Page 121 
are intentional or made through mistake, and it has been held that the fact that a misrepresentation in securing a policy of insurance was made innocently will not prevent rescission of a contract of insurance on the ground of misrepresentation.Travelers Insurance Co. v. Evslin, 101 N.J. Eq. 527; AetnaLife Insurance Co. v. Sussman, 111 N.J. Eq. 358. See, also,Eibel v. Von Fell, 55 N.J. Eq. 670. Representations made with knowledge, which are untruthful representations of a material fact, are deemed fraudulent. See Commercial Casualty InsuranceCo. v. Southern Surety Co., 100 N.J. Eq. 92; affirmed, 101 N.J. Eq. 738,
wherein this court (at p. 96) says: "* * * in equity an untruthful representation of a material fact, though there be no moral delinquency is deemed to be fraudulent. Eibel v. VonFell, supra; Straus v. Norris, 77 N.J. Eq. 33; Cowley v.Smyth, 46 N.J. Law 380." In Schoenfeld v. Winter, 76 N.J. Eq. 511,
it was held, "in order to set aside a contract founded in fraud, it is only necessary in equity to prove that the representation upon which the action is founded is false, that it is material, and that damage has ensued; * * *." I am firmly of the opinion that the misrepresentations made by the defendant Holmes in his application for the insurance policy in question were wittingly false, and that they were material to the risk, and that if the fact were made known by the defendant Holmes in his application for said policy of insurance that he had been treated by physicians, the number of times he was treated, and that he had been X-rayed, and that doctors who attended him had informed him that he was suffering from chronic psoasis, chronic appendicitis and Potts' disease, together with some of the other ailments which are mentioned in the proofs herein, that complainant would not have issued the policy of insurance in question at the premium therein mentioned.
Complainant is entitled to the relief sought herein, that is, the surrender and cancellation of the policy of insurance in question. In New York Life Insurance Co. v. Steinman, 103 N.J. Eq. 403,
Vice-Chancellor Leaming said: "The existence of a complete defense, based on fraud, in a court *Page 122 
of law, falls short of and does not ordinarily constitute such an adequate remedy for the defendant as should impel a court of equity to refuse to entertain a bill filed by the defrauded party for the cancellation and surrender of the contract, since the opportunity to make the defense may be lost, or the ability to make it may be weakened, by the studied delay of the other party, and a mere defense at law does not embrace the relief of cancellation or surrender." See, also, Keystone Dairy Co. v.New York Life Insurance Co., 19 Fed. Rep. 2d 68. The proofs herein establish misrepresentations which are tantamount to fraud which exonerate the complainant from liability under the aforesaid policy of insurance. The conclusion is inescapable that the defendant Holmes was well aware that he was not in "good health" at the time of making application for the policy of insurance in question, yet he deliberately stated in answer to question eight, "are you now in good health?" "yes." He also deliberately misrepresented facts well known to him which were material to the insurance risk as to complaints for which he had been attended by a physician during the three years preceding the date of the application, for in answer to question nine, "on what dates and for what complaints have you been attended by a physician during the past three years?" he answered, "none." Such misrepresentations, coupled with the misrepresentations hereinabove adverted to as to question ten of the application, clearly manifests to me that the defendant Harry C. Holmes, on August 5th, 1930, well knowing that he was not in "good health" obtained the policy of insurance in question and paid the first premium thereon, with a deliberate purpose of practicing a willful deception on complainant. The complainant has sustained the burden of proof cast upon it by law to establish a fraud alleged herein. I will advise a decree granting to complainant the relief it prays herein. *Page 123