JAMES L. JOHNSON, PLAINTIFF-APPELLANT, v. METRO-
POLITAN LIFE INSURANCE COMPANY, A NEW YORK
CORPORATION, DEFENDANT, AND PROGRESSIVE LIFE
INSURANCE COMPANY, A NEW JERSEY CORPORA-
TION, DEFENDANT-RESPONDENT.

Argued November 18, 1968—Decided March 17, 1969.

424

Mr. *Eugene T. Radcliffe* argued the cause for appellant (*Messrs. Powell and Davis,* attorneys).

Mr. *Burton L. Fundler* argued the cause for respondent (*Messrs. Mirne, Nowels, Fundler, Cornblatt & Magee,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J.  This is a suit upon a health and accident policy issued by defendant Progressive Life Insurance Company (the claim against Metropolitan Life Insurance Company was disposed of by the parties).  The insured died before trial and his personal representative was substituted. Plaintiff obtained judgment on a jury verdict, but the Appellate Division reversed, finding that the carrier was entitled to prevail as a matter of law.  *Johnson v. Metropolitan Ins. Co.,* 99 *N. J. Super.* 463 (*App. Div.* 1968).  We granted plaintiff's petition for certification.  51 *N. J.* 466 (1968).

## I

The policy was issued on December 13, 1961. Annexed to it is a copy of the application. Questions 10 and 13 are involved. They read:

"10. Have you ever been treated for, or ever been told that you had any one or more of the following: Tuberculosis, or other disease of the respiratory system? _No_ Epilepsy? _No_ Heart Disease? _No_ High or low blood pressure? _No_ Kidney disease? _No_ Stomach or gall bladder trouble? _No_ Diabetes? _No_ Rheumatism in any form? _No_ Disease of the brain or nervous system? _No_ Any impairment of sight, speech or hearing or any disease of eye, ear, nose or throat? _No_

\* \* \* \* \* \* \* \*

13. Have you consulted a physician or other practitioner within the past five years or to the best of your knowledge and belief have you had any illness or disease not mentioned in the answers above? Yes [✕] No [ ]"

Immediately below the list of questions appears:

"REMARKS:—Give full details including names and addresses of attending physicians, dates and reasons when any questions 8 through 13 are answered 'Yes'."

At this point, the application, referring to 13, disclosed only that a hydrocele was removed surgically by Dr. R. Gove of Brant Beach, New Jersey.

The insured became totally disabled on August 5, 1963 because of Alzheimer's disease, a disease of the brain, from which he ultimately died. The insurer agreed there was no misrepresentation with respect to that disease. Nonetheless the insurer resisted the claim because of unrelated representations it contends were false and material to the acceptance of the insurance risk. Specifically, the insurer contended the deceased had suffered from and been treated for coronary insufficiency and should have so stated in response to the questions quoted above.

The wife of the insured sought to testify that the insured disclosed to defendant's agent all of the facts defend-

ant claims were withheld. Defendant objected on procedural grounds. It complained that plaintiff had not filed a reply to its answer and had not revealed the tendered proof in the pretrial order. Defendant added that the agent was no longer in its employ and it was not prepared to meet the proposed proof. The trial court sustained the objection. Although our judgment does not turn upon it, we note our disagreement.

The proffered proof was simply part of plaintiff's denial of the truth of the separate defense in the answer that there had been a misrepresentation. *R. R.* 4:8–4 provides that "Averments in any answer setting forth an affirmative defense shall be taken as denied, when not avoided in a reply; issue shall be deemed to have been joined upon averments in an answer setting forth other matters." Defendant could have explored plaintiff's factual claim by pretrial discovery. In any event it should have at the pretrial conference, but, as is too often the case, no effort was made to smoke out the factual positions of the parties. Defendant was content with a restatement of its separate defense in general terms with no specificity at all, and plaintiff did no more than reaffirm the allegations of her complaint. The pretrial order was plainly inadequate. When litigants thus shun an opportunity to find out what is involved, they are not well situated to complain. We add that in a case of this kind an insurer could hardly be unaware of a possible charge that answers in the application were incomplete because its agent filtered out data he deemed to be of no interest to his employer. An applicant could understandably look to the agent for an explanation of questions which may be unclear when related to the applicant's factual situation.

We turn to the evidence that was admitted. It appears that the insured had some pain in his chest and shoulder for which he consulted Dr. Gove on November 19, 1957. He saw Dr. Gove on December 3, 13, and 27 of that year. Dr. Gove, who is not a cardiologist, took an electrocardiogram which, he believed, showed some minimal changes "suggestive of coro-

nary insufficiency." Dr. Gove said he advised the patient not to work for a while and prescribed medication for coronary insufficiency, but the record is not clear whether he did so only on the possibility that it existed. The closest the witness came, in answer to counsel for the defendant who had produced him, was:

"Q. And your diagnosis as a result of that [the electrocardiogram mentioned above] in November 1957 was a definite coronary insufficiency, was it not, Doctor? A. Clinically, that was my impression."

The doctor's testimony is also obscure as to whether he told his patient he suffered from coronary insufficiency or only that there was a possibility of it. The direct examination on behalf of defendant reads:

"Q. Did you make any diagnosis as to what his condition was on November 19, 1957, Doctor? A. I felt he had a coronary insufficiency.
Q. And did you tell Mr. Johnson what your findings were? A. I don't have anything written to that effect, but I'm sure I did."

Whatever Dr. Gove told his patient, it appears he did not tell him that coronary insufficiency was itself a "disease." The doctor said that "coronary insufficiency itself is not a disease. It is more of a symptom, really, than it is specifically a disease. People present symptoms of coronary insufficiency. It is not really a specific disease in itself, to my knowledge." Asked whether there were any chest complaints after 1957, Dr. Gove said, "I think when I was looking over my notes that on the 27th of October of '61 he complained of pains in his chest, at which time I gave him medication also for chest pains, although I didn't see in my notes what my diagnosis was, but the drug that I gave him was primarily for cardiac distress." There was no testimony as to what he told the patient at that time.

As we noted above, Dr. Gove first saw his patient with respect to the chest complaint on November 19, 1957. He said he advised the patient to see a specialist on December 13, 1957 but did not know whether he did. It appears that

on May 5, 1959 the patient consulted Dr. Slotoroff. Dr. Slotoroff, who also was not a cardiologist, took an electrocardiogram which was negative, and had the patient examined by a radiologist to seek other possible explanations of the complaint. Dr. Slotoroff concluded and told the patient there was no coronary artery disease and "convinced him he could do his active work without any problem."

There was also expert testimony that the electrocardiogram taken by Dr. Gove in November 1957 was within normal limits; that examinations in 1964, after the onset of the fatal illness, revealed no evidence of heart disease or coronary disease; that medically the findings in 1964 negate the hypothesis of coronary insufficiency in 1957; and that the distress experienced in 1957 was the result of tensions associated with the insured's work as a builder.

The insured's wife testified that her husband told her in 1957 that Dr. Gove said he might have a heart condition; that Dr. Gove had simply advised him not to work so hard; that her husband was able to work throughout the period in question; that he did not feel he had a heart condition; that in 1959, being tired, he went to Dr. Slotoroff to get his opinion; that after the consultation with Dr. Slotoroff, her husband said he did not think there was anything wrong with his heart; and that her husband made no complaint of chest pain from 1958 on.

In an effort to show the insured knew he had a cardiac disease, defendant introduced the hospital records in connection with the illness which ultimately took his life. The records show that upon admittance the insured was partially paralyzed and his speech was slurred. The "Past medical history" included "3–5 yrs ago had 'Heart attack' & nervous breakdown. Patient gives vague hx [history]." The record notes that "patient is a builder — has much tension on job — patient cried during history at realization of paralysis." A request to a specialist for evaluation recited that patient "Had possible cardiac problem several years ago." The consultant's report reads in part:

"Patient interviewed and examined. History is a little difficult to elicit because of slurred speech. I can't get a clearcut history of heart attack as such. He says it was finally called a nervous breakdown. Apparently did have some chest pain at that time but was not hospitalized or kept from work. No recent history of angina, dyspnea or cardiac decompensation. * * *"

The consultant's comment was:

"I do not think this man has any significant cardiovascular disease that would interfere or complicate surgery. ECG is normal. BP within normal limits. There is no clue as to possible primary other than brain. * * *"

Elsewhere the hospital record repeats "ECG normal. Hx of heart attack 3–5 years ago??"

The hospital record could be found to be perfectly compatible with the testimony of the insured's wife that he had accepted the opinion of Dr. Slotoroff that his distress was only a passing experience attributable to the tension of his building business. It is understandable that a man afflicted with a serious seizure would recount everything that could possibly aid in the diagnosis of his immediate illness even though he had theretofore been satisfied there was no heart disease. The hospital record itself reveals the insured spoke only in terms of possibility.

The trial court held as a matter of law that there was a misstatement, but left to the jury the question whether in fact the insured suffered from a heart disease including a coronary insufficiency or a cardiovascular disease at any time from November 19, 1957 through May 23, 1959 (the period between the first visit to Dr. Gove and the last visit to Dr. Slotoroff), which question the jury answered in plaintiff's favor. The trial court apparently found the misstatement consisted of the failure to refer to the medical consultations with Dr. Gove and Dr. Slotoroff. The Appellate Division found that Question 13 called for that disclosure, and concluded the omission was fatal as a matter of law.

We think that Question 10, rather than Question 13, is involved. Question 13 deals with two subjects, (1) consultation with physicians during a five-year period and (2) the existence, to the applicant's knowledge, of any illness or disease not mentioned in prior answers. Although the two subjects are separated by the word "or," it would be a strained reading to say Question 13 called for a disclosure of all medical consultations even though there was no "illness or disease." An applicant could readily believe the subjects were meant to be related and were dealt with in a single question for that reason. We should therefore take that view of the question.

■■ What then is an "illness or disease"? Surely it is not every passing indisposition. *Urback v. Metropolitan Life Ins. Co.*, 130 *N. J. L.* 210, 214 (*E. & A.* 1943). An applicant would assume the reference is to illnesses and disease entities as they are commonly understood. Upon that view, the supposed coronary insufficiency, if deemed a distinct disease entity separate from "heart disease," could come within Question 13, but the question is addressed to the understanding of the applicant, and there is no evidence that he understood coronary insufficiency to be itself an "illness" or "disease." Dr. Gove, who alone held the impression that the applicant was, or might be, so afflicted, testified that he did not deem coronary insufficiency to be a discrete illness or disease. We do not understand defendant to maintain that coronary insufficiency is a disease within Question 13 rather than a symptom of a "heart disease" within Question 10. Surely it could not be held as a matter of law on this record that the insured had some other "illness" or "disease."

We proceed then to Question 10. An affirmative answer to any part of that question would call for disclosure of attending physicians, and this by reason of the provision headed "Remarks," quoted at the outset of this opinion. The issue is whether there should have been a "yes" answer to "heart disease," and upon that basis, a reference to Dr.

Gove (beyond the mention of the removal of a hydrocele by him) and to Dr. Slotoroff.

We note the application did not inquire as to specific symptoms, such as chest pains. See, for example, *Gallagher v. New England Mutual Life Ins. Co. of Boston*, 19 *N. J.* 14, 17 (1955), and *Equitable Life Assurance Society v. New Horizons, Inc.*, 28 *N. J.* 307, 310–311 (1958). Rather it inquired only in terms of "heart disease."

■ Literally, Question 10 did not ask whether the applicant had a heart disease but rather whether he was ever "treated for" or "told" that he had such a disease. It could be said that Dr. Gove "treated" the insured for "heart disease" even if the insured did not suffer from it since Dr. Gove prescribed medication directed to such a disease or the possibility of it. So, too, if Dr. Gove "told" the insured he had a heart disease, again, literally, an affirmative answer would be required even if Dr. Gove himself had later retracted his opinion. It is not clear that the insurer ever took that view of the question. An applicant could believe the insurer was interested in the existence of the ailment and not in a mere mistaken diagnosis and hence that no disclosure was desired when the final opinion was negative. The question being ambiguous in that regard, the insurer could not insist upon a different reading of it. As was said in *Urback v. Metropolitan Life Ins. Co., supra*, 130 *N. J. L.*, at 214, "If, by reason of an ambiguity in the form of the question, the answer 'may state the truth or may state a falsehood according as the ambiguity is resolved,' the question is construed most strongly against the insurer."

■ In any event, if the question should be read to require disclosure of the physicians notwithstanding the later opinion negating the disease, the misstatement could not be said to be material as a matter of law. A court has no way of knowing what an insurer would do if it had the views of both Dr. Gove and Dr. Slotoroff and the facts upon which those views were based. The statute provides that a false statement shall not bar recovery unless it "materially affected

either the acceptance of the risk or the hazard assumed by the insurer." *N. J. S. A.* 17:38–13.4(*C*). The insurer argued that such evidence was in the case in the form of its letter of rescission. But a self-serving communication could not suffice. Nor did the letter assert a misstatement upon that thesis. Rather the letter said the policy was rescinded because the insured *"had a serious condition* that was not revealed on the application" (emphasis ours).

We turn then to the premise that Question 10 inquired as to the actual existence of a heart disease. On that premise, the insurer had to show, not merely that the insured suffered from the ailment but also that he knew it, for a question relating to the existence of a disease is addressed to the applicant's knowledge as well as to the medical fact. *Merchants Indemnity Corp. v. Eggleston,* 37 *N. J.* 114 (1962); *Shapiro v. Metropolitan Life Ins. Co.,* 114 *N. J. Eq.* 378 (*E. & A.* 1933). Question 15 itself so provides, since it calls for a representation that the answers in the application are "true and complete to the best of your knowledge and belief."

Upon that view of Question 10, there was no misstatement unless the insured (1) suffered from a heart disease and (2) knew and believed it. The issue was clearly for the jury. The trial court, however, did not ask the jury to determine whether the insured knew he had a heart disease. Rather, proceeding on the premise that there was a misstatement, the trial court concluded the only triable issue was whether the misstatement was "material," and that issue the trial court reduced to the question whether the insured in fact suffered from a heart or cardiovascular disease. As we have said, the question whether the insured had such a disease bore upon the primary issue of misstatement rather than upon materiality. At any rate the jury thus received the case on a basis more favorable for the insurer than should have been the submission.

The jury found the insured did not suffer from a heart or cardiovascular disease, and that finding the evidence amply

supports. We think the jury's determination fairly resolved the factual merits of the case as it was tried by the parties.

We think plaintiff was also entitled to prevail for the following reason.

## II

The insurer defended on the premise that it could void the policy for so-called "equitable fraud" consisting of a material misrepresentation though innocently made. We think the insurer had to prove the insured intended to defraud it.

The answer did not allege an intent to deceive, and although the pretrial order amended the answer "to include defense that policy is void because of fraud in the inception, and that it has the right to rescind for fraud," the insurer seemingly intended no departure from its thesis that "fraud" includes "equitable fraud." The trial court so understood the insurer's position and the insurer did not object to the following statement by the trial court:

"It is urged by the plaintiff, and the defendant appears to concede the point, that the misrepresentations were innocent at best."

The question whether there must be an intent to deceive turns upon our statute. *N. J. S. A.* 17:38-13.2(A) requires the policy to contain a provision no less favorable to the insured than:

"(2) A provision as follows:
Time limit on certain defenses: (a) After three years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such three-year period.

(The foregoing policy provision shall not be so construed as to affect any legal requirement for avoidance of a policy or denial of a claim during such initial three-year period, nor to limit the appli-

cation of section 3(B), (1), (2), (3), (4) and (5) in the event of misstatement with respect to age or occupation or other insurance.)

(A policy which the insured has the right to continue in force subject to its terms by the timely payment of premium (1) until at least age 50 or, (2) in the case of a policy issued after age 44, for at least five years from its date of issue, may contain in lieu of the foregoing the following provision (from which the clause in parentheses may be omitted at the insurer's option) under the caption 'incontestable':

After this policy has been in force for a period of three years during the lifetime of the insured (excluding any period during which the insured is disabled), it shall become incontestable as to the statements contained in the application.)"

The policy here contained the following, with a two-year limitation rather than the higher three-year period the statute would permit:

"Time Limit on Certain Defenses: (a) After two years from the date of policy no misstatements, except fraudulent misstatements, made by the applicant in the application for this Policy shall be used to void this Policy or to deny a claim for loss incurred or disability (as defined in this Policy) commencing after the expiration of such two year period."

The issues with respect to the statute are these: (1) Do the words "fraudulent misstatements" include so-called equitable fraud or do they require an intent to defraud in addition to a material misrepresentation? (2) Does the statute cover the denial of a claim for disability which commences within the two-year period? (3) Is the insurer limited to "fraudulent misstatements" if it does not contest the policy by a pleading filed in court within the two-year period or is it sufficient for the insurer to give extra-judicial notice of rescission within that period?

The statute was drawn on the hypothesis that in its absence an insurer could rescind a policy for an innocent misrepresentation of a material fact. Our cases so held, even after the insured loss had occurred. Most of them related to life insurance as to which the rule persisted despite a statutory enactment that "all statements purporting to be

made by the insured shall, in the absence of fraud, be deemed representations and not warranties." *N. J. S. A.* 17:34–15*d.* That statute was construed to require in actions at law, not only a material misrepresentation, but also an intent to deceive, *Urback v. Metropolitan Life Ins. Co., supra,* 130 *N. J. L.,* at 211–212, but, curiously, that interpretation of the statute somehow was not accepted as a binding statement of legislative policy in the Court of Chancery, which continued to relieve an insurer for a material misrepresentation innocently made. *Equitable Life Assurance Society v. New Horizons, Inc., supra,* 28 *N. J.,* at 314. One Vice Chancellor understandably thought the statute should mean the same thing in a court of equity and hence to require proof of a fraudulent intent, *Shapiro v. Metropolitan Life Ins. Co.,* 110 *N. J. Eq.* 287, 289 (*Ch.* 1932), but the Court of Errors and Appeals affirmed his judgment without commenting upon that proposition. Instead it found the claimant there should prevail on the ground that questions relating to diseases or state of health were addressed also to the insured's knowledge and belief, 114 *N. J. Eq.* 378, 381 (*E. & A.* 1933), a concept which antedated that decision and served to ameliorate the rule permitting an insurer to undo the contract for an honest material misrepresentation.

Equitable fraud is obscured by its label. Fraud connotes an intent to do wrong. When one misrepresents innocently, there is no such intent. Still it may be wrong to insist upon an advantage thus obtained, and when that is so, a refusal to undo the transaction could be characterized as "fraudulent." *Du Bois v. Nugent,* 69 *N. J. Eq.* 145, 151 (*Ch.* 1905); 3 *Pomeroy, Equity Jurisprudence* (*5th ed.* 1941), § 888, *pp.* 492–495. But if the *status quo* cannot be restored, a new element is added, for the question then is which of two innocent parties should bear a loss that has intervened. So with respect to an insurance risk, the return of the premium would hardly restore the insured to his prior situation. The issue is not solved by denouncing the insured in terms of fraud. Insurance companies do invite business, and when

they offer to take a risk upon the applicant's representations rather than upon their own medical examination and investigation, they know that an honest response to the questions they phrase is all they can expect. Thus "equitable fraud" is a debatable doctrine after the loss. So it is aptly said in 5 *Williston, Contracts (Rev. ed. Williston and Thompson* 1937), § 1500 *pp.* 4191–4192, that "It is to be remembered also that rescission presupposes a restoration of the *status quo,* and this may be impossible, for example, where after the death of one whose life was insured, the insurer discovers innocent misrepresentations made by the insured in procuring the policy." Under 2 *Restatement, Contracts* (1932), § 486, comment a, illustration 1, rescission would be denied after loss unless there was an intent to deceive. *Cf. Merchants Indemnity Corp. v. Eggleston, supra,* 37 *N. J.,* at 124; but see *N. Y. Life Insurance Co. v. Weiss,* 133 *N. J. Eq.* 375, 379 (1943).

With this background we approach the issues of statutory construction. The insurer says the phrase "except fraudulent misstatements" does not import an intent to deceive, and hence preserves the concept of equitable fraud. But upon that view the provision would accomplish nothing, whereas it is unmistakable that the purpose was to improve the position of the insured. The insurer argues the provision would still accomplish something, by foreclosing a right to rescind for an *immaterial* misrepresentation. The short answer is that the same statute expressly provides elsewhere that a false statement will not bar recovery unless it "materially affected either the acceptance of the risk or the hazard assumed by the insurer." *N. J. S. A.* 17:38–13.4(*C*).

Hence the provision can have no significance unless the phrase "except fraudulent misstatements" requires an intent to deceive. The Statement annexed to the bill said the purpose was to adopt the provisions of the "Uniform Individual Accident and Sickness Policy Provisions Law" approved by the National Association of Insurance Commissioners on June 15, 1950. There unfortunately is little

original source material, but the research in a note in 27 *N. Y. U. L. Rev.* 670, 677, 678 (1952), supports the view that an intent to defraud is required. We see no reason to say that "fraudulent" means only "material" and thus drain the word of its natural meaning. This is especially so since the insurer remains free to avoid liability for a material misrepresentation made with an intent to defraud, and it is hardly unjust to limit it to that position.

The next question is whether the statutory provision leaves untouched the situation where an insurer defends against a disability which commenced within two years after the issuance of the policy. The insurer says the provision deals only with a disability which commences after the expiration of the two-year period and thus accomplishes no change with respect to a disability which commenced within the two-year period. The insurer's position is supported by *Bronson v. Washington National Insurance Co.,* 59 *Ill. App.* 2d 253, 207 *N. E.* 2d 172 (*Ct. App.* 1965), and *Taylor v. Metropolitan Life Ins. Co.,* 106 *N. H.* 455, 214 *A.* 2d 109 (*Sup. Ct.* 1965).

We are unable to accept that view. The statute is unhappily phrased. This is understandable since, we are told, the language is all the draftsmen could agree upon. See Note, 27 *N. Y. U. L. Rev., supra,* at 674–675.

To say the provision deals only with a disability which commences after two years is to give no effect at all to the first part which says unequivocally that "After two years from the date of issue of this policy no misstatement, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy * * *." If we correctly understood counsel for the insurer at the oral argument, he advanced the suggestion that a distinction be drawn between voiding the policy and denying a claim, so that even if the insurer could not void the policy after two years except for "fraudulent" misstatements, it could nonetheless defend at any time against a claim for disability which arose within the two-year period on the

basis of misstatements although not "fraudulent." This distinction will not withstand analysis.

The fallacy in the insurer's suggestion lies in the assumption there is a difference between *voiding the policy* and *denying a claim* under it. There can be no such distinction when the fraud relied upon reposes *in the making of the contract*. When a claim is denied because of misrepresentations in the application for insurance, the thesis can only be that the insurer has rescinded the contract on that account. We do not understand how else a claim for benefits can be defeated because of fraud in the application.

This is made evident by pursuing the insurer's approach. Suppose, first, that the misrepresentation in the application is unrelated to the cause of the disability, which is the situation before us. If that claim for disability can be denied on that account, so also can any other claim for disability. In short, none of the policy coverage would remain. Yet, if the thesis of the defense is not that of rescission of the contract, it would follow that the insurer is entitled to keep the premium although freed of its bargain. And if, when the misrepresentation is related to the particular disability claim, the insurer could deny liability and still retain the contract, obviously the paid-for policy coverage would be reduced without any reduction in premium. No such result would have been permitted prior to the statute, see *Merchants Indemnity Corp. v. Eggleston, supra*, 37 *N. J.*, at 130–131, and we think it inconceivable that the Legislature intended so extraordinary an innovation.

■ The answer is that a party who wants to avoid performance of his contract because of fraud in the making of the contract must rescind it. Hence when the provision speaks of the voiding of the contract after two years, it necessarily deals with a rescission made to defend against a claim for disability whether the disability arose within or after the two-year period. It means that after two years the insurer cannot avoid liability for a disability which com-

menced within the two-year period "except for fraudulent misstatements."

Thus the statute, as we interpret it, boils down to the proposition that after two years the policy may not be voided for a misstatement in the application unless the misstatement is "fraudulent" as we have defined the word, and it makes no difference whether the disability commenced before or after the expiration of the two-year period. If this seems too simple a view of the statutory language, we can say only that we see no other acceptable conceptual approach to its meaning. Surely our view accords with the purpose of the legislation to give the insured some "peace of mind * * * as to the validity of the policy." See Note, 27 *N. Y. U. L. Rev., supra,* at 671.

We appreciate that this interpretation makes superfluous the concluding phrase "commencing after the expiration of such two-year period." Indeed, it is the addition of that phrase which obscures the provision's meaning, as is apparent when the provision is read without it. But, as we have said, to permit that phrase to control, so that the provision would deal with a disability commencing after two years and with nothing else, would render meaningless the first portion of the provision and the time limitation it contains. We must remember that the purpose of a clause placing a time limit on challenges to the insurance application is to give security to the policyholder, and sensibly that purpose is achieved by measuring the period of contest from the date of the issuance of the policy rather than from the date when a disability happens to occur. To permit the tail-end phrase to control the entire provision would thus run against the sense of an incontestable clause.

No matter how the total provision is approached, there is an obscurity generated by the final phrase. Obviously the draftsmen were not of a single mind. They settled upon an ambiguity, and the best a court can do is to resolve that ambiguity in a way which will serve the implicit promise to give some security to the insured while dealing fairly

also with the insurer. As we have said, the insurer has really lost little or none of what in justice it ought to have when it is permitted to void the policy at any time at all upon proof of fraudulent misstatements.

This brings us to the final question whether an insurer which seeks to void the policy for misstatements in the application must do so by a pleading filed within the two-year period, failing which the insurer is remitted to proof of "fraudulent misstatements." It is the general rule that a carrier must thus initiate the contest within the stipulated time period of an incontestable clause. Annotation, 95 *A. L. R. 2d* 420 (1964). This view was adopted in *Metropolitan Life Ins. Co. v. Lodzinski*, 121 *N. J. Eq.* 183, 184–185 (*Ch.* 1936), and the Court of Errors and Appeals, in reversing on a finding that the insurer's action was instituted on the last day of the contestable period, thereby acted upon the basis of the rule without qualifying comment. 122 *N. J. Eq.* 404, 406 (*E. & A.* 1937).

That rule rests upon the premise that the incontestable clause is intended to give the insured a sense of security after the stated period elapses, and that since the clause in substance is a period of limitations, the insurer's claim for rescission should be asserted within the stipulated period by a suit brought by the insurer or by a defensive pleading if the insured has already instituted an action.

The statutory provision before us was intended to serve the role of an incontestable clause. It will be noted in the quoted excerpt from the statute that it permits the insurer to substitute a more conventionally phrased incontestable clause if the insured has the right to continue the policy to at least age 50 or for at least five years if the policy is issued after age 44. The note already cited, 27 *N. Y. U. L. Rev., supra,* at 675, explains that the caption "incontestable" was reserved for noncancellable policies because it might lead the holder of a cancellable policy to think it could not be terminated after the contestable period had run. But both provisions are intended to secure the insured with re-

spect to challenges to the truth of the application. We see no reason to treat the provision before us differently with respect to the obligation to level the attack in a judicial proceeding within the time period. We note that the provision is followed in the statute by the parenthetic statement that "The foregoing policy provision shall not be so construed as to affect any legal requirement for avoidance of a policy or denial of a claim during such initial three-year period * * *." We read this to permit application of the requirement that the insurer must seek to avoid by a complaint or answer filed within the stipulated period.

Here the pleading challenging the validity of the contract was filed well beyond the time limit. The insurer could not rely upon equitable fraud. Under this statute, it remained free to assert the misstatements were made with an intent to deceive. As we have said, it did not defend on that basis.

With respect to the other issues, we agree with the disposition made of them by the Appellate Division.

The judgment of the Appellate Division is therefore reversed and the judgment of the trial court is affirmed.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.