584 A.2d 190

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, PLAINTIFF–APPELLANT, v. ANNA MARIE MANZO A/K/A NINA MANZO AND THE ESTATE OF ALBERT MANZO, JR., DEFENDANTS AND THIRD–PARTY PLAINTIFFS–RESPONDENTS, AND EQUIFAX SERVICES, INC., A CORPORATION OF THE STATE OF GEORGIA; 20TH CENTURY CONSULTANTS, INC., A CORPORATION OF THE STATE OF NEW JERSEY; JACK LAROCCA, HOOSHANG KIPIANI AND BRUCE BERBERIAN, THIRD–PARTY DEFENDANTS.

Argued October 9, 1990—Decided January 16, 1991.

*Eugene M. Haring* argued the cause for appellant (*McCarter & English; Eugene M. Haring* and *David R. Kott*, of counsel; *Eugene M. Haring, David R. Kott, B. John Pendleton, Jr.,* and *Penelope M. Taylor*, on the briefs).

*Michael F. Chazkel* argued the cause for respondents (*Chazkel & Bergenfield,* attorneys; *Michael F. Chazkel* and *Richard A. Epstein,* on the brief).

*William R. Holzapfel* submitted a brief on behalf of *amici curiae* American Council of Life Insurance and Health Insurance Association of America (*LeBoeuf, Lamb, Leiby & Mac-Rae,* attorneys).

*Burtis W. Horner* submitted a brief on behalf of *amicus curiae* The Prudential Insurance Company of America (*Stryker, Tams & Dill,* attorneys; *Burtis W. Horner* and *Wilma M. Kenny,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue is whether within the period of contestability an insurer may rescind the life insurance policy of an insured whose false representations in his insurance application affected the insurer's estimate of the risk and the calculation of the premium. After a non-jury trial, the Chancery Division held that the false statements of the decedent, Albert Manzo, Jr., in his application constituted equitable fraud warranting rescission of the policy. The Appellate Division reversed, holding that the false statements did not materially affect either the insurance company's acceptance of the risk or the hazard assumed. 234 *N.J.Super.* 266, 560 *A.*2d 1215 (1989). One judge dissented, and the defendant-insurer, Massachusetts Mutual Life Insurance Company (Mass.Mutual), appealed as of right. *R.* 2:2–1(a)(2). We now reverse the judgment of the Appellate Division and reinstate the Chancery Division's judgment of rescission.

–I–

In June 1983, Manzo, a forty-six-year old resident of Wayne, New Jersey, signed Part I of a two-part application to purchase a $500,000 life insurance policy from Mass.Mutual. The conclusion of Part I states that the policy will not take effect unless

"at the time of payment * * * all statements in the application are complete and true as though they were made at that time."

On June 28, 1983, in the course of a medical examination by Mass. Mutual's doctor, Manzo falsely answered "no" to the following questions in Part II of the application:

4. Have you ever been advised of, treated for, or had any known indication of:

    *      *      *      *      *      *      *      *

    F. Sugar, albumen, blood or pus in urine * * *?

    G. Diabetes, thyroid or other endocrine * * * disorder?

Manzo also falsely denied consulting a physician other than for a routine check-up in the five years prior to the application. In fact, during that time Manzo had been hospitalized twice.

The conclusion of Part II contained the following clause immediately above the space reserved for the applicant's signature:

To the best of my knowledge and belief all answers and statements are full, complete and true and were correctly recorded before I signed my name below.

Manzo signed the completed Part II of the application on June 28, 1983, the day of the examination.

Mass. Mutual obtained a statement from Dr. Hooshang Kipiani, Manzo's personal physician, that at his last physical check-up, in July 1983, Manzo had been in "good physical condition." On July 29, 1983, Manzo paid Mass. Mutual $200 and signed a "conditional receipt," which stated that the insurance would not take effect unless "all answers and statements in any part of the application having an earlier date are complete and true as though given on the date of this receipt."

On August 22, 1983, Manzo was found in the trunk of his car, shot to death. Mass. Mutual issued Manzo's policy on August 31, 1983, effective June 13, 1983, at standard rates, with an annual premium of $1,345. The policy contained a rider providing that Mass. Mutual would waive Manzo's premiums if he were to become disabled.

Following Manzo's death, Mass. Mutual conducted a further investigation, which revealed Manzo's long history of diabetes

and related problems. Based on this information, Mass. Mutual filed suit against Manzo's primary beneficiary, Anna Marie Manzo, a/k/a Nina Manzo, and the Estate of Albert Manzo, Jr., seeking rescission because of equitable fraud.

Manzo's medical records showed that in 1968, he was hospitalized and diagnosed by Dr. Kipiani as having diabetes mellitus. As Dr. Kipiani testified, diabetes may be controlled with medicine and diet, but is incurable. Manzo thus suffered from the disease when he filled out the insurance application. Furthermore, Manzo's medical records indicate that his diabetes was not "well controlled." Blood tests performed during Manzo's two 1979 hospitalizations revealed an extremely high glucose level in his blood, evidencing his inability to control his diabetes.

Manzo unquestionably knew of his diabetic condition. Dr. Kipiani had discussed Manzo's diabetes with him and had warned him of the necessity of controlling the disease. Additionally, Dr. Kipiani had prescribed medication for Manzo's diabetes and put him on a low-calorie diet. Furthermore, on June 18, 1982, just one year before completing the Mass. Mutual insurance application, Manzo signed an application for life insurance from General Life Insurance Company of Wisconsin. In Part II of that application, he had answered affirmatively when asked whether he had ever been treated or had any known indication of diabetes or sugar in his urine.

After reviewing Manzo's medical records, Dr. William Coons, medical director for Mass. Mutual, concluded that if he had known of Manzo's condition before the issuance of the policy, he would have recommended that Mass. Mutual issue a "rated policy" with moderate-to-high premiums, instead of a policy with standard rates. John Behan, the underwriter who had authorized the issuance of Manzo's policy, testified that knowledge of Manzo's diabetes would have affected his judgment in approving the application, estimating the risk, and fixing the premium. Specifically, Behan testified that he would not have

issued the policy at standard rates but would have set the premium at two and one-half times those rates. Further, he would not have authorized the rider waiving the premium in the event of disability. Finally, he would have required Manzo to undergo additional tests and would have requested Dr. Kipiani to complete a "diabetes questionnaire" before issuing any policy.

The trial court found that Manzo knew he had diabetes when he signed the application, a finding that the Appellate Division concluded "is supported by adequate and credible evidence." 234 *N.J.Super.* at 285, 560 *A.*2d 1215. The trial court further found that Mass. Mutual had relied on Manzo's false statements in issuing the policy, setting the premium, and providing for a waiver of premium. Concluding that Manzo had committed equitable fraud, the court ordered rescission of the policy.

The Appellate Division reversed. 234 *N.J.Super.* at 296, 560 *A.*2d 1215. Doubting the appropriateness of granting rescission based on equitable fraud after Manzo's death, *id.* at 283–85, 560 *A.*2d 1215, the court held that Manzo's misrepresentations did not warrant rescission. It said that Mass. Mutual had failed to prove that Manzo's diabetes either rendered him uninsurable or caused his death. *Id.* at 294–95, 560 *A.*2d 1215. The court ordered reformation of the policy, thereby entitling defendants to the $500,000 proceeds, less the premiums that Manzo would have paid had Mass. Mutual known of his disease. *Id.* at 296, 560 *A.*2d 1215.

In dissent, Judge Landau disagreed with the majority that the Life and Health Insurance Code, *N.J.S.A.* 17B:17–1 to :26A–8, permits rescission only if an insurer proves that the misrepresented facts either would have rendered the applicant uninsurable or that they were causally related to the loss. 234 *N.J.Super.* at 296, 560 *A.*2d 1215. In Judge Landau's view, the trial court properly granted rescission based on Mass. Mutual's showing that the misrepresented facts influenced its judgment

when estimating the degree and character of the risk and when fixing the premium. *Id.* at 297–98, 560 *A.*2d 1215.

We conclude that the dissenting opinion represents the better view. In sum, we hold that equitable fraud should be available as a grounds for post-loss rescission and that within the period of contestability an insurer may rescind a policy if the insured knowingly misrepresented facts that would have affected the estimate of the risk and the premium charged.

## II

Initially, the Appellate Division questioned the fairness of allowing a life insurer to invoke equitable fraud after the death of the insured. 234 *N.J.Super.* at 289, 560 *A.*2d 1215. The principle that equitable fraud, like legal fraud, is available to rescind a life insurance policy even after the death of the insured is, however, "firmly embedded in the jurisprudence of this State." *Formosa v. Equitable Life Assurance Soc'y,* 166 *N.J.Super.* 8, 13, 398 *A.*2d 1301 (App.Div.), *certif. denied,* 81 *N.J.* 53, 404 *A.*2d 1153 (1979) (citations omitted). Purporting to rely on *Johnson v. Metropolitan Life Insurance Co.,* 53 *N.J.* 423, 251 *A.*2d 257 (1969), the Appellate Division concluded that rescission based on equitable fraud would be unduly harsh because the parties could not be restored to their position before Manzo's death. 234 *N.J.Super.* at 282–83, 560 *A.*2d 1215. The *Johnson* opinion, however, did not undermine the fundamental principle that equitable fraud is available to rescind a life insurance contract after the insured's death. See *Formosa, supra,* 166 *N.J.Super.* at 14, 398 *A.*2d 1301; *Russ v. Metropolitan Life Ins. Co.,* 112 *N.J.Super.* 265, 278–79, 270 *A.*2d 759 (Law Div.1970). *Johnson* held only that equitable fraud was not available to the insurer as a grounds for rescission after the expiration of the period of contestability. 53 *N.J.* at 438, 251 *A.*2d 257. In *Johnson,* we did not address whether equitable fraud would be available to rescind an insurance policy after a loss, but within that contestability period.

Both *Formosa* and *Russ* held that a life insurance policy may be rescinded because of equitable fraud, even after the death of

the insured, if the insurer files suit within the period of contestability. *Formosa, supra,* 166 *N.J.Super.* at 13, 398 *A.*2d 1301; *Russ, supra,* 112 *N.J.Super.* at 278–79, 270 *A.*2d 759; *see Parker Precision Prods. Co. v. Metropolitan Life Ins. Co.,* 407 *F.*2d 1070, 1073 (3d Cir.1969); *Equitable Life Assurance Soc'y v. New Horizons, Inc.,* 28 *N.J.* 307, 312–13, 146 *A.*2d 466 (1958); *Gallagher v. New England Mut. Life Ins. Co. of Boston,* 19 *N.J.* 14, 20, 114 *A.*2d 857 (1955); *Metropolitan Life Ins. Co. v. Tarnowski,* 130 *N.J.Eq.* 1, 3, 20 *A.*2d 421 (E. & A.1941); *Metropolitan Life Ins. Co. v. Lodzinski,* 124 *N.J.Eq.* 357, 359, 1 *A.*2d 859 (E. & A.1938). Viewed in isolation, this rule may sometimes yield a seemingly harsh result. The rule must be considered, however, in light of *N.J.S.A.* 17B:25–4, which renders a life insurance policy incontestable, except for non-payment of premiums, two years after issuance. So viewed, the rule reflects a fair balancing of the interests of the insurer and the insured.

The statute provides:

> There shall be a provision that the policy (exclusive of provisions of the policy or any contract supplemental thereto relating to disability benefits or to additional benefits in event of death by accident or accidental means or in event of dismemberment or loss of sight) shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue.

### [*N.J.S.A.* 17B:25–4.]

Through limiting the time period in which insurance companies could contest life insurance contracts, the Legislature balanced the interests of the insurer in rescinding a fraudulently-obtained policy with those of the insured in security of coverage. By its terms, the statute does not limit contestability to the lifetime of the insured. We would contravene the words and policy of the statute if we were to impose such a limitation. A court may not disregard the plain words of a statute merely because they occasionally lead to an unhappy result. Within the period of contestability, an insurer may contest a policy for equitable fraud whether the insured is dead or alive. Consequently, Mass. Mutual, which contested the policy within the

two-year statutory period, may properly rely on equitable fraud as grounds for rescission.

## –III–

It remains to consider whether Mass. Mutual has established that Manzo committed equitable fraud. To warrant rescission, Manzo's misrepresentations must be material within the meaning of *N.J.S.A.* 17B:24–3(d), which provides:

The falsity of any statement in the application for any policy or contract covered by this section may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer.

In its construction of the statute, the Appellate Division concluded that the insurer must prove that the insured lied with the intent to defraud, 234 *N.J.Super.* at 294, 560 *A.*2d 1215, and that the misrepresented disability either rendered the insured uninsurable or was causally related to his or her death. We disagree with both conclusions.

## –A–

■ We first discuss the Appellate Division's conclusion that *N.J.S.A.* 17B:24–3(d) allows rescission only if the applicant had an "intent to defraud" the insurance company. 234 *N.J.Super.* at 294, 560 *A.*2d 1215. Although the Appellate Division noted that the traditional definition of equitable fraud does not require such an intent, *id.* at 289, 560 *A.*2d 1215 (citing J.N. Pomeroy, *Equity Jurisprudence* § 873 at 421 (5th ed. 1941)), it nonetheless imposed that requirement on Mass. Mutual's claim. The imposition of that requirement was error.

*N.J.S.A.* 17B:24–3(d) addresses only the effect of the false statement on the actions of the insurer. It says nothing about the intent of the insured. In 1951, moreover, the Legislature deleted language from a predecessor statute, 1937 *N.J.Laws* 618 § 6 (amended 1951), which applied only to accident and sickness policies. The predecessor statute provided:

The falsity of any statement in the application for any policy covered by this act shall not bar the right to recovery thereunder *unless such false statement was*

*made with actual intent to deceive* or unless it materially affected either the acceptance of the risk or the hazard assumed. [Emphasis added.]

The deletion of the emphasized language is persuasive evidence of the Legislature's intent not to impose such a requirement in actions to rescind insurance policies. Hence, we conclude that *N.J.S.A.* 17B:24–3(d) does not require proof of an actual intent to deceive.

The Appellate Division was concerned about the seeming unfairness of permitting an insurer to rescind after the death of the insured on the basis of an unintentional misrepresentation. New Jersey courts have traditionally attempted to alleviate this apparent unfairness by distinguishing between "subjective" and "objective" questions. 234 *N.J.Super.* at 285, 560 *A.*2d 1215; *Formosa, supra,* 166 *N.J.Super.* at 25, 398 *A.*2d 1301; *see* J. Appleman, *Insurance Law & Practice* § 246 at 129 (1981) (Appleman). The line between the terms is sometimes indistinct. For example, courts have characterized the questions "do you have diabetes," *Formosa, supra,* 166 *N.J.Super.* at 16, 398 *A.*2d 1301, and "have you any physical defect," *Russ, supra,* 112 *N.J.Super.* at 270–71, 270 *A.*2d 759, as subjective. In the present case, however, the parties have not questioned the distinction in the lower courts or before us. Furthermore, we are confronted with an insured who knowingly misrepresented that he did not have diabetes. Hence, we need not consider the extent to which an innocent misrepresentation may justify the rescission of a life insurance policy.

In this case, the application asked Manzo whether he had been "advised of, treated for, or had any other known indication of" diabetes or sugar in his urine. The application also inquired whether Manzo had consulted a physician within the preceding five years. Manzo answered these questions falsely. He also falsely answered the question whether he had suffered any "mental or physical disorder" within the preceding five years. The trial court found that Manzo knew and believed that he had diabetes at the time that he answered those questions. Mass. Mutual thus met its burden of proving that Manzo's misrepre-

sentations constituted equitable fraud. It need not go further and prove that Manzo harbored an intent to defraud. *See Russ, supra,* 112 *N.J.Super.* at 271, 270 *A.*2d 759.

–B–

■ We now turn to the interpretation of the "materiality" requirements of *N.J.S.A.* 17B:24–3(d). The language of the statute is in the disjunctive. A false statement bars "the right of recovery" if it "materially affected *either* the acceptance of the risk *or* the hazard assumed by the insurer." *N.J.S.A.* 17B:24–3(d) (emphasis added). The Appellate Division determined that Manzo's misrepresentations did not affect either alternative. In making that determination, the Appellate Division concluded that only those misrepresentations that render an applicant uninsurable are material to the acceptance of the risk. We believe that conclusion is too restrictive. So stringent a test would be an incentive for dishonesty; it puts the dishonest applicant in a better position than the honest one. Under such a test, an insurer would be bound unless the misrepresented disability would have precluded the issuance of the policy. Thus, the dishonest applicant would stand to gain if the lie goes undetected and would risk nothing by lying.

We believe that a better test of materiality is one that encourages applicants to be honest. See *Longobardi v. Chubb,* 121 *N.J.* 530, 541–42, 582 *A.*2d 1257. That belief is supported by established law.

In 1922, the Court of Errors and Appeals found that false concealment of medical history on a life insurance application was material to the insurer's risk if it "naturally and reasonably influence[d] the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium." *Kerpchak v. John Hancock Mut. Ins. Co.,* 97 *N.J.L.* 196, 198, 117 *A.* 836 (1922). Here, the Appellate Division concluded that the Legislature had overruled *Kerpchak* by enacting *N.J.S.A.* 17B:24–3(d), which permits rescission only if a false statement "materially affected

either the acceptance of the risk or the hazard assumed." 234 *N.J.Super.* at 287, 560 *A.*2d 1215. We find no support for that conclusion. Contrary to the Appellate Division, we conclude that *N.J.S.A.* 17B:24–3(d) was not intended to alter the *Kerpchak* definition of materiality.

New Jersey courts have uniformly relied on *Kerpchak* to determine the materiality of false statements in life insurance applications. *See, e.g., Parker Precision Prods. Co., supra,* 407 *F.*2d at 1073; *Gallagher, supra,* 19 *N.J.* at 20–21, 114 *A.*2d 857; *DeVinney v. Prudential.Ins. Co.,* 128 *N.J.L.* 270, 274, 25 *A.*2d 254 (1942); *Urback v. Metropolitan Life Ins. Co.,* 127 *N.J.L.* 585, 586, 23 *A.*2d 568 (1941); *Locker v. Metropolitan Life Ins. Co.,* 107 *N.J.L.* 257, 260–61, 151 *A.* 627 (E. & A.1930); *Prudential Ins. Co. v. Holmes,* 111 *N.J.Eq.* 115, 120, 162 *A.* 135 (Ch.Div.1932). Using the *Kerpchak* definition of materiality, the *Formosa* court held that an insured's misrepresentation about his ·diabetes· "materially affected [the insurer's] acceptance of the risk" under *N.J.S.A.* 17B:24–3(d). 166 *N.J.Super.* at 21, 398 *A.*2d 1301. We likewise conclude that *Kerpchak* provides the appropriate definition of materiality under the statute. By denying coverage to insureds who lie, the test encourages applicants to tell the truth.

The *Kerpchak* test also comports with the legislative intent. Although it has amended *N.J.S.A.* 17B:24–3(d) on several occasions since *Formosa* was decided in 1979, the Legislature has never redefined materiality. The Legislature's failure to modify a judicial determination, while not dispositive, is some evidence of legislative support for the judicial construction of a statute. *White v. Township of N. Bergen,* 77 *N.J.* 538, 576, 391 *A.*2d 911 (1978); *Quaremba v. Allen,* 67 *N.J.* 1, 14, 334 *A.*2d 321 (1975); *Lemke v. Bailey,* 41 *N.J.* 295, 301, 196 *A.*2d 523 (1963). The inference of legislative acquiescence is fortified if, as here, the Legislature has amended a statute several times without altering the judicial construction. *Lemke, supra,* 41 *N.J.* at 301–02, 196 *A.*2d 523.

Leading commentators on insurance law similarly have embraced a definition based on whether the misrepresentation reasonably related to the estimation of the risk or the assessment of the premium. *See* Appleman, *supra,* § 7294 at 368; 7 Couch, *Insurance 2d* § 35:79 at 127 (1965) (Couch). Additionally, the test has been widely accepted by courts in other jurisdictions when interpreting language similar to that of *N.J.S.A.* 17B:24–3(d). *See, e.g., Bush v. Washington Nat'l Ins. Co.,* 534 *N.E.*2d 1139, 1142 (Ind.App.1979); *Schneider v. Washington Nat'l Ins. Co.,* 200 *Kan.* 380, 396–398, 437 *P.*2d 798, 812 (1968); *Lamark v. Lincoln Income Life Ins. Co.,* 169 *So.*2d 203, 206 (La.App.1964), *writ refused,* 247 *La.* 347, 170 *So.*2d 866 (1965). In sum, we conclude that such a reasonable-relationship test correctly defines the circumstances under which misrepresented facts "materially affect" an insurer's "acceptance of the risk."

█ In this case, Manzo misrepresented his health and medical history on his application for insurance. If Mass. Mutual had known the facts, it would have requested more information and issued a policy at a premium two and one-half times the standard rate that Manzo was charged. Thus, Manzo's misrepresentations "naturally and reasonably" affected Mass. Mutual's estimation of the degree of the risk and its calculation of the premium. It follows that the misrepresentations "materially affected * * * the acceptance of the risk" and that Mass. Mutual is entitled to rescind the policy. As regrettable as the loss of coverage may be to his beneficiary, that loss is compelled by Manzo's misrepresentations.

The Appellate Division recognized that an insurer need show only that the misrepresentation materially affected either the acceptance of the risk or the hazard assumed. 234 *N.J.Super.* at 293–94, 560 *A.*2d 1215. After determining that Manzo's misrepresentations did not influence Mass. Mutual's acceptance of the risk, it further concluded that the false statements did not materially affect the "hazard assumed" by Mass. Mutual. *Id.* at 294, 560 *A.*2d 1215. Under its construction of *N.J.S.A.*

17B:24–3(d), "the hazard assumed * * * includes the requirement that there be a causal connection between the insured's false statements and the ultimate cause of death." *Id.* at 294, 560 *A.*2d 1215. In so construing the statute, the court implicitly rejected, without citing, the earlier decision of another panel of the Appellate Division that "emphatically reject[ed] the * * * suggestion that there must be a causal relationship between an applicant's false statements and the cause of his death [to prevail in an action to] rescind a life policy [because of] * * * equitable fraud." *Formosa,* 166 *N.J.Super.* at 22, 398 *A.*2d 1301.

By requiring a causal connection between the disability misrepresented and the insured's death, the decision below conflicts not only with *Formosa,* but also with the general rule that "in the absence of a statute establishing a different rule, there need be no causal connection between the cause of death and the misrepresentation." Couch, *supra,* § 37:110 at 632. This rule is accepted by a majority of jurisdictions. Couch, *supra,* §§ 37:87 at 102 and 37:110 at 632; Appleman, *supra,* § 245 at 125; R. Keaton and A. Widiss, *Insurance Law, A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices* 572 n. 20 (West 1988) (the "clear majority rule" is that no causal connection is required); *see, e.g., Shafer v. John Hancock Mut. Life Ins. Co.,* 410 *Pa.* 394, 399, 189 *A.*2d 234, 237 (1963) ("It is of no consequence that the death ensued from a cause unconnected with the false representations."). We are persuaded that the majority rule is the correct one. An insurer is entitled to relief when it relies on incorrect information provided by an insured in an insurance application if the information was material either to the insurer's decision to insure or to the terms of the contract. As the Legislature perceived in *N.J.S.A.* 17B:24–3(d), the law should encourage insureds to tell the truth, not to conceal information from the insurer and gamble that they will not die of a concealed disease.

The judgment of the Appellate Division is reversed and the judgment of the Chancery Division is reinstated.

*For reversal and reinstatement* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.