234 N.J. Super. 266 (1989)
560 A.2d 1215
MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, PLAINTIFF-RESPONDENT,
v.
ANNA MARIE MANZO A/K/A NINA MANZO AND THE ESTATE OF ALBERT MANZO, JR., DEFENDANTS-THIRD-PARTY PLAINTIFFS-APPELLANTS,
v.
EQUIFAX SERVICES, INC., A CORPORATION OF THE STATE OF GEORGIA; 20TH CENTURY CONSULTANTS, INC., A CORPORATION OF THE STATE OF NEW JERSEY; JACK LAROCCA, HOOSHANG KIPIANI AND BRUCE BERBERIAN, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 1989.
Decided June 14, 1989.
*269 Before Judges PETRELLA, SHEBELL and LANDAU.
Michael F. Chazkel argued the cause for appellant.
David R. Kott argued the cause for respondent (McCarter & English, attorneys; Eugene M. Haring, of counsel and on the brief; David R. Kott, also on the brief).
No other parties participated in the appeal.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Massachusetts Mutual Life Insurance Company (Massachusetts Mutual) instituted suit against the Estate of Albert Manzo, whom it had insured, and his wife as the named beneficiary. It sought a declaratory judgment that its so-called "conditional receipt" executed by Manzo, as well as its life insurance policy issued after Manzo's death in connection with that receipt, were not effective to pay benefits because certain conditions precedent had not been met. Massachusetts Mutual also sought *270 rescission of the life insurance policy on the ground of equitable fraud. This relief was sought notwithstanding that Manzo died from causes totally unrelated to any illness; he was shot to death. After a bench trial the judge essentially adopted the proposed findings of facts submitted by plaintiff's attorneys[1] and concluded that the issuance of the insurance policy had been induced by Manzo's equitable fraud. A judgment rescinding the policy was entered.
On this appeal appellants argue that: (1) the doctrine of equitable fraud should be unavailable to an insurer after a loss has occurred; (2) the misrepresentations were either not material or not proved to be material by clear and convincing evidence so as to preclude coverage, particularly since Manzo died of an unrelated risk; (3) the judge erred in not permitting defendants to reopen their case; and (4) Parts I and II of Manzo's application for insurance to Massachusetts Mutual were improperly admitted into evidence.
Albert Manzo, the decedent, had been solicited for the purchase of a Massachusetts Mutual life insurance policy by Jack LaRocca of Twentieth Century Consultants, Inc., an authorized agent of Massachusetts Mutual. On or about June 8, 1983 Manzo signed Part I of a two part application to purchase a $500,000 policy. Above Manzo's signature on the last page of *271 Part I, which called for certain general information from the prospective insured, was the following:
LIABILITY OF COMPANY  The first premium (or the cost to reinstate) may be paid to the Company's agent in exchange for a Conditional Receipt signed by that agent. If this is done, the Company shall be liable only as set forth in that Receipt. If the first premium (or cost to reinstate) is not paid, the Company shall have no liability unless and until:
[.] The application has been approved by the Company at its Home Office; and
[.] The first premium (or cost to reinstate) has been paid during the lifetime of all persons to be insured by the policy; and
[.] In the case of new life insurance, the policy has been delivered to the person named as owner in the policy; and
[.] At the time of payment (and delivery for new life insurance) all statements in the application are complete and true as though they were made at that time.
If any of these conditions is not met, the new life insurance (or reinstatement) applied for shall not take effect.
On June 28, 1983 Manzo signed Part II of the application which, in pertinent part, contained the following printed clauses above his signature:
I agree that: (1) this application consists of Parts 1 and 2 and any amendments and supplements which shall be attached to the policy issued, and (2) no knowledge on the part of any agent, medical examiner or any other person as to any facts pertaining to me shall be considered as having been made or brought to the knowledge of the Company unless stated in either Part 1 or 2 of this application or any amendments or supplements.
To the best of my knowledge and belief all answers and statements are full, complete and true and were correctly recorded before I signed my name below.
Part II was apparently completed in conjunction with a physical examination on June 28 by Dr. Bruce Berberian who had been retained by Massachusetts Mutual for that purpose. Berberian apparently recorded Manzo's answers to the questions on Part II based on Manzo's responses. The following questions and answers are relevant to this appeal:
2. A. Name and address of your physician. [Ans.] Dr. Kipiani
B. Date and reason last consulted. [Ans.] Jan. 1982 cold-medicine
4. Have you ever been advised of, treated for, or had any known indication of:
 Yes No
* * *
 F. Sugar, albumen, blood or pus in urine ...? ____ X 
 G. Diabetes, thyroid or other endocrine (glandular) ____ X 

*272 * * *
6. Other than above, within the past five years have you:
 A. Had any mental or physical disorder? ____ X 
 B. Had a checkup, consultation, illness, injury,
 surgery? X ____
* * *
 D. Had electrocardiogram, X-ray, other diagnostic
 tests? X ____
* * *
For any questions answered "Yes," give particulars below. For medical histories, include nature of ailment, date, duration and attending physicians.
6. B & D  3/23/82 Dr. Kipiani saw proposed insured for routine physical exam  and EKG-normal.
Dr. Berberian also completed a medical examiner's report which was sent with Part II of the application to Massachusetts Mutual. The report indicated that Manzo, born December 12, 1936, was on June 28, 1983 six feet three inches tall, and weighed 275 pounds. A urine sample obtained by Dr. Berberian was forwarded to Massachusetts Mutual which had a laboratory analysis performed on the sample. The result was negative. No traces of sugar were found in the urine.
Massachusetts Mutual requested and obtained from Dr. Hooshang Kipiani, Manzo's personal physician, an attending physician's statement indicating that at the time of Manzo's last checkup in July 1983 (after the application date) his weight was 283 1/2 pounds and he was in good physical condition. On July 24, 1983, Manzo paid LaRocca $200 as the first premium on the policy and executed a conditional receipt which said at the top that it did not create any temporary or interim insurance, but was only utilized to set the effective date for the policy Massachusetts Mutual had under consideration for issuance. The receipt contained certain conditions:

*273 Conditions That Must Be Met Before Any Insurance Becomes Effective. The insurance (or reinstatement) applied for will become effective ONLY IF all the following conditions are met.
1. All required parts of the application and medical examinations and tests we require have been completed within 60 days of the date of this receipt.
2. Each person proposed for insurance is an acceptable risk under our limits, rules and standards for the basic policy plan and amount of insurance applied for (or to be reinstated) and for any rider or agreement applied for (or to be reinstated).
3. The payment made is the correct first premium (or cost to reinstate) for insurance on the basis applied for, including any extra premium required for a substandard risk.
4. On the date of this receipt, all answers and statements in any part of the application having an earlier date are complete and true as though given on the date of this receipt.
If any of these conditions is not met, the insurance shall not take effect. Then, this receipt will terminate and our only liability will be to return the payment made.
The conditional receipt acknowledged that LaRocca received $200 on behalf of Massachusetts Mutual "to pay the first premium for an insurance policy on the life of Albert Manzo." It also said just above Manzo's signature:
I have read this receipt and have received a signed copy of it. I understand that it states when the insurance (or reinstatement) applied for will become effective if all required conditions are met, but that it does not provide any temporary or interim insurance. I agree to the terms, conditions and limits of this receipt.
There is no dispute that subsequently Massachusetts Mutual's underwriting department reviewed the policy and made a determination to issue it based on the information it had. This included the fact that on August 22, 1983, Manzo was found dead in the trunk of a car, the victim of a gunshot wound. Notwithstanding this knowledge, Massachusetts Mutual issued and delivered the life insurance policy on August 31, 1983, with coverage effective as of June 13, 1983.
The policy was issued at standard rates and provided for payment of an annual premium of $1,345 which included $210 to cover a waiver of premium rider which provided that Massachusetts Mutual would pay the premiums if Manzo became totally disabled during the policy period. The policy required *274 that payments of the premiums be made in advance of the expiration date in the policy, or the date of death, if earlier, and that premiums could be paid annually, semiannually or quarterly. Coverage was provided only for the period covered by the payment. Attached to the policy and made a part thereof were Parts I and II of Manzo's application. The policy delivered to Mrs. Manzo, the beneficiary, stated in part:
We rely on all statements made by or for the Insured in the application. Legally, these statements are considered to be representations and not warranties. We can contest the validity of this policy for any material misrepresentation of a fact. To do so, however, the misrepresentation must have been made in the application and a copy of the application must have been attached to this policy when issued.
We must bring any legal action to contest the validity of this policy within two years from its Issue Date. After that we cannot contest its validity, except for failure to pay premiums.
After Manzo's death, and apparently after issuance of the policy, Massachusetts Mutual engaged in further investigation of Manzo's medical history. Prior to issuance of the policy they had apparently obtained the Medical Information Bureau report which presumably did not show any indication of a diabetic condition. The post-death investigation revealed that in 1968 Manzo had been hospitalized and was diagnosed as having diabetes mellitus.
Deposition testimony of Dr. Kipiani was introduced at the trial. Kipiani had diagnosed Manzo in 1969 as having adult onset diabetes. He informed Manzo of this and discussed the condition with him. Dr. Kipiani placed Manzo on an 1,800 calorie diet and prescribed Diabinese, an antidiabetic drug. According to Dr. Kipiani, it was difficult to discuss Manzo's condition with him because Manzo did not want to believe he had diabetes and tended to ignore it and not take the medication. In 1975 Dr. Kipiani performed intestinal bypass surgery on Manzo because his weight was up to 635 pounds. Dr. Kipiani also testified that subsequent to the intestinal bypass surgery Manzo lost a substantial amount of weight. He was able to control his diabetes by a reduction in weight alone, without medication. Manzo's weight was about 283 to 288 *275 pounds the last time Dr. Kipiani saw him in July 1983 and this was "a very good result."
During a 1979 hospitalization blood tests were taken that indicated that Manzo had a very high glucose level (292 milligrams per deciliter). He was placed on an antidiabetic drug, Orinase. Manzo was again hospitalized in July 1979. Blood tests taken during that hospitalization revealed a very high glucose level (256 milligrams per deciliter). According to Massachusetts Mutual's medical expert the hospital records showed that Manzo's diabetes was not well controlled.
Dr. Kipiani testified that Manzo, whom he saw irregularly, "was a compulsive eater and it was difficult to control his habit." In 1982 Dr. Kipiani prescribed an additional antidiabetic drug, Orinase. He said that although Manzo could have controlled his diabetes with a low calorie diet, he was not capable of doing so, so he did not take Manzo off the medication. The doctor also said in a deposition that Manzo "probably" had diabetes in 1983 when he applied for the insurance and he added: "the only thing we could do to diabetes is control it, either with a diet or medication. You just can't make it disappear." Diabetes was not reported in an attending physician's statement submitted by Dr. Kipiani to Massachusetts Mutual in 1983 in connection with Manzo's insurance application. Kipiani stated that Manzo was in good physical condition at that time. In his testimony Dr. Kipiani did not explain why he did not disclose Manzo's diabetic condition. However, when asked what he meant by saying that Manzo was in good physical condition the doctor stated that after performing a physical examination on Manzo "[w]e didn't find anything abnormal so that we considered the patient in good condition." In light of Manzo's dramatic loss of weight he was considered in "especially good condition." Dr. Kipiani testified that at that time he also found Manzo in good physical condition with respect to his blood sugar levels.
*276 Massachusetts Mutual had its Medical Director, Dr. William Coons, testify about his duties and the counseling of insurance underwriters in determining risks associated with policy applications. His function also included advising underwriters about whether to accept or reject certain applications or to issue a policy at a nonstandard rate with a higher premium. His review of the medical records after issuance of the policy revealed that Manzo had been prescribed various antidiabetic medications by Dr. Kipiani at various times since 1969, and that at several points Manzo had very high blood sugar levels. He concluded from these records that Manzo's diabetes was not well controlled.[2]
Dr. Coons described various complications that can develop with diabetes, such as: renal failure; blindness; cardiovascular disease; peripheral vascular disease resulting in amputation of limbs; artery disease; and sudden coronary incidents. He said that knowledge of Manzo's diabetes since 1969 would have influenced his judgment under Massachusetts Mutual's underwriting rules "in making the contract, estimating the risk or fixing the premium." He testified that in hindsight he would not have recommended that the policy be issued at standard rates, but would have recommended that Manzo be issued a rated policy with a higher premium. He said his answer would be the same even if the sugar in Manzo's urine sample was within normal limits without antidiabetic medication since people with diabetes have a shorter life span whether or not their diabetes is kept under control. He concluded that even if Manzo's diabetes had been well controlled he would have been issued a rated policy at a higher premium.
Joseph Behan, the Massachusetts Mutual underwriter who authorized the policy's issuance, testified that prior to writing the policy he had received and reviewed the completed Part II *277 of Manzo's insurance application and relied on Manzo's statements as well as Dr. Kipiani's attending physician's statement. Behan acknowledged that prior to issuance of the policy he had learned of Manzo's death by shooting. The policy was subsequently issued at standard rates. However, the full annual premium of $1,345 was not received. If he had known Manzo had a diabetic condition since 1969 the policy would not have been issued at standard rates, but he would have authorized issuance of a rated policy at a higher premium since knowledge of diabetes would have affected his judgment in making the insurance contract, estimating the risk and fixing the premium. Moreover, he would have requested additional information from Dr. Kipiani to determine the severity of Manzo's condition, and he would have attached a specific diabetic questionnaire to his request for information and "requested both a blood test and a fasting blood sugar and hemoglobin" test. Behan acknowledged that a urinalysis was performed on Manzo's urine sample, but he said that sugar in the urine was merely a symptom and was not diagnostic for diabetes, as was a blood test.
Had he known of Manzo's diabetes Behan estimated that the premium would have been approximately two and one-half times greater than the $1,135 basic policy premium and that he would not have authorized the waiver of policy premium rider which had been issued for an additional premium of $210. He asserted that at no time during the underwriting process, and up until the time he authorized issuance of the policy, did he have any knowledge of Manzo's diabetic condition.
On cross-examination Behan conceded that Manzo's urinalysis revealed no signs of any antidiabetic drug nor any signs of sugar in the urine. Behan also admitted that in underwriting the Manzo policy he had great latitude in assessing risk and determining whether to authorize a standard rate policy, a rated policy at a higher premium or to deny issuance of a policy altogether. He explained that in the underwriting process every applicant begins with a mortality factor of 100, meaning 100% mortality. A system of debits and credits are applied to *278 that factor based on the established risk of the applicant as determined under certain medical and health categories. Depending on the total of rating debits accumulated, a rating percentage is assigned by reference to a chart. This percentage begins at the standard policy rate and increases to 300% of the standard rate depending upon the total rating debits accumulated.[3]
In Manzo's case Behan said that if he knew of the diabetic condition he would have started with the basic mortality factor of 100 debits and then added 100 debits for Manzo's diabetes by reference to a chart in the underwriters' manual, which took into account adult onset diabetes, age and duration of the disease. Additional debits were added because Manzo was overweight (40 debits according to a "build chart"), resulting in total debits of 240 which would have placed Manzo at 250% greater than the standard rated policy or two and one-half times greater than the standard or basic policy premium of $1,135.[4]
Behan testified that based upon Manzo's debit rating he would be entitled to a possible maximum of 75 credits based on the debit rating of 240. Although Behan conceded the potential *279 for subtracting such credits, he maintained that in no event would Manzo have been issued a policy at standard rates.
Massachusetts Mutual introduced into evidence Part II of an application for the purchase of a life insurance policy by Manzo from a different company, General Life Insurance Corporation of Wisconsin (General Life), dated June 18, 1982, and signed by Manzo. In Part II of that application, which is similar to that of Massachusetts Mutual, the response "yes" had been checked next to a question about whether Manzo had ever been treated or ever had any known indication of diabetes or sugar in the urine. The application form also noted that Manzo had "mild diabetes, on diet" and glycosuria[5] over a two year period, which "responds to diet."
Manzo's wife testified regarding her husband's health history. She said that late in the 1960s her husband told her that during hospitalization a trace of sugar was discovered in his urine, but that he had never discussed with her whether he had diabetes. For only a couple of months in the late 1960s she filled prescriptions for her husband for Orinase, which she knew was prescribed to control the trace of sugar found and "to help in the cure of that." After that she only filled prescriptions for a drug used to control her husband's weight.
Manzo's wife confirmed that after his 1975 intestinal bypass surgery he lost considerable weight. Her husband saw a Dr. Barnett about every year and one-half for regular checkups; a Dr. Katz who was a cardiologist and an internist; and had occasional visits to Dr. Kipiani, the family physician who performed the intestinal bypass surgery. She testified that the notations on the General Life application were not in her husband's handwriting, although the signature appeared to be his. Her attorney offered a document entitled "Part II  Health Statement  Complete Only For Nonmedical Application," *280 dated July 8, 1982 and signed by Manzo, which was apparently another portion of Part II of the General Life application. It also contained questions relating to diabetes and sugar in the urine, but this time the "no" box was checked. Mrs. Manzo stated that the signature on that document appeared to be her husband's, but that the remaining writing, including the "X" marks in the answer boxes did not appear to be her husband's handwriting.

I
We turn first to the issue of whether Parts I and II of the Massachusetts Mutual policy were properly admitted into evidence over defendant's objection. Following an interlocutory appeal on leave granted, we reversed the trial judge's ruling which had sustained defendant's objection to the admissibility of these documents. This decision, reported as Massachusetts Mutual Life Insurance Co. v. Manzo, 214 N.J. Super. 385, 390 (App.Div. 1986), is the law of the case. We see no reason to reconsider that determination, and hence no reason to disturb the judge's subsequent ruling as to admissibility.

II
Defendants argue that the trial judge erred in ordering rescission of the Massachusetts Mutual policy on the ground that the policy was induced by equitable fraud. They also argue that the contestability clause in the Manzo policy is ambiguous as to whether Massachusetts Mutual may seek rescission within the two year contestability period from the date of policy issuance based upon an innocent misrepresentation.
Alternatively, defendants argue that Part II of the Massachusetts Mutual application contained subjective questions, and as such the insurer was required to prove that Manzo knew and believed he had diabetes on the date the questions concerning his diabetic condition were answered in the negative. They *281 further argue that Massachusetts Mutual has not demonstrated that Manzo's alleged misrepresentations, assuming the availability of the remedy for equitable fraud, materially affected its acceptance of the risk or the hazard assumed as required by N.J.S.A. 17B:24-3(d). Defendants assert that Massachusetts Mutual must establish all the elements of its claim of equitable fraud by clear and convincing proof.
Finally, defendants argue that the judge erred in denying the defense motion to reopen the trial because of new evidence. That evidence was the remaining portion of the General Life application which had apparently been completed by Manzo in which he responded that he had known indications of diabetes and sugar in the urine, but that on another portion of that same application indicated that he did not have diabetes. After the trial was completed defendants learned that notwithstanding the affirmative answer to the diabetes question on Part II of the General Life application, that company had nevertheless issued Manzo a policy at standard rates. Counsel for Mrs. Manzo and the estate sought to reopen the trial to admit the General Life policy and call a witness from General Life to provide testimony. Defendants argue that the judge erred in denying their motion because he failed to recognize that when another insurance company issues a policy at a standard rate to a known diabetic it is either dispositive or provides a "strong indicia" of the standard applied in the insurance industry for issuing policies under such conditions. It may be, as Massachusetts Mutual argues, that it is reasonable for different life insurance companies to have different underwriting standards. In any event, we see no abuse of discretion in the judge's ruling and decline to disturb it.
We reject defendants' argument that the General Life application had not been authenticated. Requests for admissions had been propounded by Massachusetts Mutual asking defendants to admit that Part II of the General Life application was genuine and authentic, and was signed by Manzo. The *282 failure to respond to that request resulted in the requested admission being conclusively established. R. 4:22-2.
Defendants point out that the testimony revealed that Manzo had only a mild case of diabetes, and that he did not even believe he had the disease. They imply that the trial judge relied solely on the answers to questions contained on the General Life application as dispositive on the issue of subjective questions, and that such reliance was misplaced. They argue that there can be no reliance on the General Life application because it was not established that Manzo completed or signed it. However, these arguments do not controvert the evidence that in 1969 and at times thereafter Manzo had been informed that he had diabetes, and that he had taken medication for the disease.
Defendants contend that application of the equitable fraud doctrine after a loss has occurred has essentially been repudiated in Johnson v. Metropolitan Life Insurance Company, 53 N.J. 423, 437-438 (1969), where then Chief Justice Weintraub, speaking for a unanimous Court, said:
Equitable fraud is obscured by its label. Fraud connotes an intent to do wrong. When one misrepresents innocently, there is no such intent. Still it may be wrong to insist upon an advantage thus obtained, and when that is so, a refusal to undo the transaction could be characterized as `fraudulent.' DuBois v. Nugent, 69 N.J. Eq. 145, 151 (Ch. 1905); 3 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 888, pp. 492-495. But if the status quo cannot be restored, a new element is added, for the question then is which of two innocent parties should bear a loss that has intervened. So with respect to an insurance risk, the return of the premium would hardly restore the insured to his prior situation. The issue is not solved by denouncing the insured in terms of fraud. Insurance companies do invite business, and when they offer to take a risk upon the applicant's representations rather than upon their own medical examination and investigation, they know that an honest response to the questions they phrase is all they can expect. Thus `equitable fraud' is a debatable doctrine after the loss. So it is aptly said in 5 Williston, Contracts (Rev. ed. Williston and Thompson 1937), § 1500 pp. 4191-4192, that `It is to be remembered also that rescission presupposes a restoration of the status quo, and this may be impossible, for example, where after the death of one whose life was insured, the insurer discovers innocent misrepresentations made by the insured in procuring the policy.' Under 2 Restatement, Contracts (1932), § 486, comment a, illustration 1, rescission would be denied after loss unless there was *283 an intent to deceive. Cf. Merchants Indemnity Corp. v. Eggleston, supra, 37 N.J. [114] at 124; but see N.Y. Life Insurance Co. v. Weiss, 133 N.J. Eq. 375, 379 (1943).
Johnson dealt with the aspect of materiality at 53 N.J. at 433-434:
In any event, if the question should be read to require disclosure of the physicians notwithstanding the later opinion negating the disease, the misstatement could not be said to be material as a matter of law. A court has no way of knowing what an insurer would do if it had the views of both Dr. Gove and Dr. Slotoroff and the facts upon which those views were based. The statute provides that a false statement shall not bar recovery unless it `materially affected either the acceptance of the risk or the hazard assumed by the insurer.' N.J.S.A. 17:38-13.4(C). The insurer argued that such evidence was in the case in the form of its letter of rescission. But a self-serving communication could not suffice. Nor did the letter assert a misstatement upon that thesis. Rather the letter said the policy was rescinded because the insured `had a serious condition that was not revealed on the application' (emphasis ours).
The Court in Johnson held that the jury's determination resolved the factual merits of the case and entitled plaintiff to prevail. Prior to Johnson it had been held that an "[i]nnocent material representation will, in equity, support rescission of an insurance contract. Scienter is not an essential element of equitable fraud." Equitable Life Assurance Society v. New Horizons, Inc., 28 N.J. 307, 314 (1958). Equitable essentially followed Metropolitan Life Insurance Co. v. Tarnowski, 130 N.J. Eq. 1, 3 (E. & A. 1941) and its statement that:
Whatever the rule be in other jurisdictions, it is embedded in our jurisprudence that, while a mere misrepresentation devoid of intent to deceive will not sustain an action in deceit at law, in equity `an untruthful representation of a material fact, though there be no moral delinquency, is deemed to be fraudulent.' Commercial Casualty Insurance Co. v. Southern Surety Co., 100 N.J. Eq. 92; affirmed, 101 N.J. Eq. 738. `There is this distinction between the rule of equity and the rule of law: At law, moral fraud must be shown to have been present in the misrepresentation (Cowley v. Smyth, 17 Vr. 382); in equity the complainant may succeed, although the misrepresentation was innocent....' (citations omitted).
Thereafter, our decision in Formosa v. Equitable Life Assurance Society, 166 N.J. Super. 8, 13 (App.Div. 1979), certif. den. 81 N.J. 53 (1979), followed the perhaps too strict rule of the pre-Johnson cases.
*284 We recognize, that in a sense, Johnson is distinguishable because it was a suit to rescind an accident and health insurance policy on the ground of equitable fraud when that suit was brought after the statutory contestable period (N.J.S.A. 17B:25-4) as incorporated in the policy.[6] 53 N.J. at 438-443. Here, as in Formosa, decedent died within the two year contestability period. Moreover, there are certain anomalies in attempting to distinguish between legal fraud and equitable fraud, particularly, when, as is often stated: "Equity follows the law." See Dunkin' Donuts of America v. Middletown Donut Corp., 100 N.J. 166, 183 (1985); Natovitz v. Bayhead Realty Co., 142 N.J. Eq. 456, 463-464 (E. & A. 1948).
N.J.S.A. 17B:25-5 contains a provision relating to the entire contract which states:
Entire contract. There shall be a provision that the policy, or the policy and the application therefor if a copy of such application is attached to or endorsed upon the policy when issued, shall constitute the entire contract between the parties, and that all statements contained in such an application shall, in the absence of fraud, be deemed representations and not warranties.
In Formosa v. Equitable Life Assurance Society, supra (166 N.J. Super. at 14-15), we relied on the trial court's opinion in Russ v. Metropolitan Life Insurance Co., 112 N.J. Super. 265, 272-280 (Law Div. 1970), where it was determined that the law supporting application of the equitable fraud doctrine to rescission *285 of insurance contracts was still viable. However, we conclude that reexamination of that conclusion is warranted with respect to the applicability of the principles in Johnson v. Metropolitan Life Insurance Co.
Massachusetts Mutual has the burden of proof in establishing its claim for rescission. See Stripp v. United Casualty Co., 124 N.J.L. 348 (Sup.Ct. 1940); 21A Appleman, Insurance Law & Practice, §§ 12428 and 12429 (1980); and 7 Couch on Insurance 2d § 35:95 (1980). Moreover, the policy of the law is to avoid forfeitures. See Metropolitan Life Insurance Co. v. Sinett, 2 N.J. Super. 506, 510 (Ch.Div. 1949); compare Allen v. Metropolitan Life Insurance Co., 44 N.J. 294, 306 (1965); Kievit v. Loyal Protective Insurance Co., 34 N.J. 475, 482 (1961).
In Formosa v. Equitable Life Assurance Society we recognized the harshness of the equitable fraud rule, and perhaps some illogic to it, and distinguished between objective and subjective questions. We noted that the rule regarding equitable fraud was not applied to the same extent in dealing with subjective questions, and observed:
With respect to subjective questions, our courts have held that such questions seek to probe the applicant's state of mind, and if a negative answer is a correct statement of the knowledge and belief it is not a misrepresentation, and thus does not constitute equitable fraud. [Citations omitted]. [166 N.J. Super. at 15].
Thus, to prevail on a claim of equitable fraud Massachusetts Mutual had to "prove not only that [the insured] actually had diabetes [on the date he signed the insurance application] but also that he knew and believed on that date when he answered the questions in the negative that he had known indications of the disease." Id. at 16.
The judge's finding that Manzo knew and believed at the time he signed the application that he had diabetes is supported by adequate and credible evidence in the record. Rova Farms Resort v. Investors Insurance Co., 65 N.J. 474, 484 (1974).

*286 III
We turn now to the argument that Massachusetts Mutual failed to establish by clear and convincing evidence that Manzo's misrepresentations materially[7] affected the risk or hazard assumed by the insurer as required under N.J.S.A. 17B:24-3(d) which provides:
The falsity of any statement in the application for any policy or contract covered by this section may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer.
In Formosa v. Equitable Life Assurance Society, supra (166 N.J. Super. at 20-21), we applied the statutory materiality requirement to a somewhat similar set of circumstances. As in the instant case, the insured in Formosa failed to disclose in his application for life insurance information relating to what this court found to be a preexisting diabetic condition. 166 N.J. Super. at 11-13. The insured there ultimately died of a disease unrelated to diabetes. Id. at 12, 17. The medical director for the insurance company testified that had he known of the insured's diabetic condition and the fact that it was controlled with medication he would have required additional information concerning the insured's medical history, including a supplementary diabetic questionnaire and a statement from a treating physician. He further testified that without this additional information a policy would not have been issued to the insured. Before concluding that the insured's false statements concerning *287 his diabetic condition were material to the insurance company's acceptance of the risk we noted portions of the medical director's testimony and commented:
While [the medical director] conceded that diabetes does not necessarily render a person uninsurable, and that, in certain circumstances, policies are issued to persons suffering from the disease, in which case a higher premium is charged, he stated emphatically that Equitable would have declined coverage for Dr. Formosa `because he was a diabetic, not under adequate supervision.' Thus, it cannot seriously be disputed that Dr. Formosa's false statements concerning his prior medical history `materially affected the acceptance of the risk.' Id. at 21.
In support of this conclusion Formosa, id. at 21, relied on and quoted Kerpchak v. John Hancock Mutual Life Insurance Co., 97 N.J.L. 196, 198 (E. & A. 1922), which said:
Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.[8]
To the extent that Kerpchak goes beyond the language later enacted in N.J.S.A. 17B:24-3d, which it clearly does, it is not controlling authority. The statute requires that a false statement is disregarded "unless it materially affected either the acceptance of the risk or the hazard assumed." Kerpchak regarded every misstatement or omission as material.
In Formosa,[9] we not only concluded, inappropriately relying on Kerpchak, that the misrepresentations were material, but also that no causal relationship need exist between the undisclosed *288 medical condition and the ultimate cause of death before an insurer may rescind a life insurance policy on equitable fraud grounds. 166 N.J. Super. at 22.
In the instant case there was testimony from Massachusetts Mutual's medical director, as well as from its underwriter, that if Manzo's condition had been known at the time the application was reviewed, certain additional information would have been requested. They said that knowledge of Manzo's diabetic condition would have affected the insurance contract with respect to estimating the risk and fixing the premium. Each witness conceded, however, that Manzo's diabetes would not have meant that a policy would not have been issued to him. They testified that Manzo would have been issued a policy despite his diabetic condition, but the policy would have been a rated policy with a higher premium instead of the standard rate policy that was actually issued. Based upon Behan's evaluation of Manzo's health risk, and with full knowledge of his diabetic condition, Massachusetts Mutual would have issued Manzo a policy at a premium two and one-half times greater than the basic premium.[10]
The facts relied on in Formosa to conclude that the insured's false statements were material to the risk stand in stark contrast to the facts of the instant case. Here it is undisputed that despite the knowledge of Manzo's diabetic condition Massachusetts Mutual would have issued him a policy, albeit at two and one-half times greater than the basic policy premium. Manzo did not even die of any disease, and hence diabetes had no impact on the loss. In Formosa the insurance company would have declined coverage altogether. 166 N.J. Super. at 21. Formosa did die of a disease, pneumonia as a complication *289 of Hodgkins disease, and diabetes was noted as a secondary condition.
Moreover, we are convinced that the harshness of the equitable fraud doctrine requires reexamination in light of Johnson v. Metropolitan Life Insurance Co., supra (53 N.J. at 433-438). In Johnson, our Supreme Court wrestled with distinctions between legal and equitable fraud and whether any fraud could exist without intent, noting that after death of the insurer the parties could not be restored to the status quo ante. 53 N.J. at 437-439.
Historically, a distinction was drawn between legal and equitable fraud. See 3 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 873, p. 421. At law there can be no fraud, misrepresentation or concealment without the necessary element of guilty knowledge and consequent intent to deceive, sometimes designated as scienter. Id. at §§ 873-875, pp. 421-426; compare Merchants Indemnity Corporation v. Eggleston, 68 N.J. Super. 235, 251 (App.Div. 1961), aff'd 37 N.J. 114 (1962) (denial of rescission was affirmed). In Eggleston, concealment was compared with misrepresentation. Although it is generally said that knowledge or belief of the party making the statement is the element that differentiates fraud at law from equitable fraud, see, e.g., Metropolitan Life Insurance Co. v. Sinett, 2 N.J. Super. 506 (1949) and Metropolitan Life Insurance Co. v. Somers, 137 N.J. Eq. 419 (Ch. 1946), as we have noted the distinction has been more recently questioned.
With these principles in mind we now turn to the materiality question presented here and the construction of the statutory language contained in N.J.S.A. 17B:24-3(d).[11] That statute precludes a life insurance company from avoiding liability on a policy unless the false statements contained in the application "materially affected either the acceptance of the risk or the *290 hazard assumed by the insurer." Our review of the case law of other jurisdictions reveals three general types of statutes. There is one type of statute illustrated in Berger v. Minnesota Mutual Life Insurance Co., 723 P.2d 388, 389 (Utah 1986) (and see statutes and cases cited at page 390 n. 2), which provides that:
a misrepresentation, omission or concealment of facts shall not prevent recovery under an insurance policy unless:
(a) fraudulent; or
(b) material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
(c) the insurer in good faith either would not have issued the policy, ... or would not have issued . .. a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.
See also Central National Life Insurance Co. v. Peterson, 23 Ariz. App. 4, 529 P.2d 1213, 1216 (1975). The statute was interpreted by the Court of Appeals of Arizona which concluded that "if the insurer is relying on the fact that it would not have provided coverage with respect to a certain hazard, that particular hazard must be the one which actually caused the loss." Id. 529 P.2d at 1216.
Under this type of statutory language the Supreme Court of Utah rejected the argument that the insurer must prove a causal connection between the fact misrepresented and the cause of the insured's death. Berger v. Minnesota Mutual Life Insurance Co., supra (723 P.2d at 391).[12] The court noted that the statutory alternatives contained in the Utah statute were stated in the disjunctive and as a result in order to invalidate a policy an insurer would be required to prove only *291 one of the provisions contained in the statute. Id. at 390. Thus, it said that under this statute a misrepresentation precludes recovery "when it is material to the risk of death assumed by the insurer." Materiality, the court stated "is measured at the time that the risk is assumed and not at the subsequent death." The court also said: "[b]ecause the materiality of a misrepresentation is related to the insurer's willingness to initially accept the risk, the ultimate cause of death may be a factor considered by the [fact-finder], but is not of itself determinative." Id. at 391. In Berger, there was undisputed evidence that the insurance company would have declined to issue the life insurance had it known about the insured's undisclosed medical condition. Based on this the Utah court concluded that the jury's determination that the insured's misrepresentation "was material to the risk of death assumed by [the insurance company]," should not be disturbed on appeal. Id. at 392.
Other states have enacted statutes which specifically provide that no misrepresentation shall be deemed material "unless the matter misrepresented increases the risk of loss or contributes to the event or contingency upon which the policy becomes payable." 43 Am.Jur.2d Insurance § 1037 (1982), and cases cited therein. An example is the Texas statute interpreted in Robinson v. Reliable Life Insurance Co., 569 S.W.2d. 28 (Tex. 1978), which reads:
`Any provision in any contract or policy of insurance issued or contracted for in this State which provides that the answers or statements made in the application for such contract or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case.' [Id. at 29 (emphasis supplied).]
The Supreme Court of Texas construed this statute as being in the disjunctive and essentially concluded that an insurance company could void an insurance policy by showing that the misrepresentation was either: 1) material to the risk, or 2) *292 actually contributed to the loss. Id. at 29-30. The court concluded that "the materiality of the risk must be viewed as of the time of the issuance of the policy, rather than at the time the loss occurred." Id. at 30. Thus, under this construction of the Texas statute there is no need for the insurer to prove that the matter misrepresented contributed to the loss as long as it can be shown that the misrepresentation was material to the risk at the inception of the insurance contract.
Finally, other states with statutes similar to our own have construed them to mean that a misrepresentation as to a matter material to the risk at the inception of the insurance contract is all that is needed to void the policy at the election of the insurer and that it is not necessary to show a causal connection between the facts misrepresented and the actual loss claimed under the policy. See, Prudential Insurance Co. v. Saxe, 134 F.2d 16 (D.C. Cir.1943), cert. den. 319 U.S. 745, 63 S.Ct. 1033, 87 L.Ed. 1701 (1943); Haubner v. Aetna Life Insurance Co., 256 A.2d 414 (D.C. 1969); Lamark v. Lincoln Income Life Insurance Company, 169 So.2d 203 (La. App. 1964), writ of review refused 247 La. 347, 170 So.2d 866 (1965); Bushfield v. World Mutual Health & Accident Insurance Co. of Pennsylvania, 80 S.D. 341, 123 N.W.2d 327 (1963). The South Dakota statute in Bushfield provided that a false statement made by an insured "may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer." Id. 123 N.W.2d at 329.
The United States Court of Appeals has found the language of the District of Columbia statute to be in the disjunctive.[13] Thus, the insurer need only show that the misrepresentation either materially affected the acceptance of the risk or materially *293 affected the hazard assumed and need not prove both elements to void a policy of insurance. Prudential Insurance Co. v. Saxe, supra (134 F.2d at 28). See also Haubner v. Aetna Life Insurance Co., supra (256 A.2d at 416) where the court construed the materiality affecting the hazard assumed as follows: "[a] misstatement to be material to the hazard assumed must be shown in some way to have affected it or contributed to the loss, and in a substantial manner."
In Golden v. Northwestern Mutual Life Insurance Company, 229 N.J. Super. 405 (App.Div. 1988), we recently touched on the question of materiality to the hazard assumed where the insured died of causes unrelated to the false statements contained in the insurance application when we said:
While we accept this recent expression of the law on this subject by our court [Formosa's language rejecting causal relationship as a requirement], we observe the language of N.J.S.A. 17B:24-3d, which reads:
d. The falsity of any statement in the application for any policy or contract covered by this section may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer. [Emphasis supplied.]
The hazard assumed by the insurer was the death of the insured. If the death resulted from some medical condition which an insured failed to reveal by false statements in the application, that hazard would of course be materially affected. The question is raised that if the death results from a different cause, as in this case, has the hazard assumed by the insurer been `materially affected'? As we read the statute cause of death makes no difference. The language of the statute is in the disjunctive. But, in view of our recent statement in Formosa, we see no reason to further address this issue, particularly since the impact of N.J.S.A. 17B:24-3d has not been briefed. [Id. 229 N.J. Super. at 422-423.]
In this case, however, the application of that statute has been briefed and was the subject of oral argument. We now examine more thoroughly the language in N.J.S.A. 17B:24-3d which requires the insurer to prove that a misrepresentation "materially affected either the acceptance of the risk or the hazard assumed." As noted in Golden, supra (229 N.J. Super. at 423), the statutory language is in the disjunctive. Thus, it is *294 reasonable to construe the statute as not requiring the proof of a material effect on both the acceptance of the risk and the hazard assumed. The insurer need only show that the misrepresentation had a material impact on one of these aspects. However, we are convinced that a reasonable construction of the hazard assumed aspect includes the requirement that there be a causal connection between the insured's false statements and the ultimate cause of death. The previously cited authorities support this construction. See Prudential Insurance Co. v. Saxe, supra (134 F.2d at 28); Haubner v. Aetna Life Insurance Co., supra (256 A.2d at 416). Under N.J.S.A. 17B:24-3d an insurer may void a policy of insurance by showing a causal link between the misrepresentation and the actual loss, or that the matter misrepresented substantially contributed to the loss. An insurer may also rescind an insurance contract by proving that the false statements materially affected its acceptance of the risk. However, under N.J.S.A. 17B:24-3d, "the insurer had to prove the insured intended to defraud it." Johnson v. Metropolitan Life Ins. Co., supra (53 N.J. at 435) (decided under the substantially similar prior version of the statute).
Manzo's false negative answers to the questions relating to diabetes were not material to the hazard assumed by the insurer. Nor did they materially affect Massachusetts Mutual's acceptance of the risk here. 3 Pomeroy (5th ed. 1941) § 898, pp. 532-534 defines a material fact as follows:
It is stated that a fact is material when, if the representation had not been made, the contract or transaction would not have been entered into. Conversely a representation is not material when it appears that the transaction would have been entered into notwithstanding it.
It is quite clear that Manzo's death had nothing at all to do with diabetes or any other medical condition. His diabetic condition did not materially affect Massachusetts Mutual's acceptance of the risk or the hazard it assumed. Therefore, the falsity of any statement in the application regarding diabetes was immaterial to the actual risk which ultimately claimed Manzo's life or the specific hazard which caused his death. *295 Presumably, the risk of being shot is factored into the underwriting risk for an individual whose normal occupation does not expose him to such a risk. Here, the deceased did not die of a disease related to diabetes. See Metropolitan Life Insurance Co. v. Alvarez, 133 N.J. Eq. 65 (Ch. 1943); Metropolitan Life Insurance Co. v. Coddington, 131 N.J. Eq. 430 (Ch. 1942); 1A Appleman, Insurance Law And Practice, § 245 (1981). Nor was Manzo uninsurable. Cf. Thompson v. Occidental Life Insurance Co. of California, 9 Cal.3d 904, 109 Cal. Rptr. 473, 513 P.2d 353 (1973). Under the testimony Massachusetts Mutual would have issued the life insurance policy here even if it had known of Manzo's diabetic condition, albeit at a higher premium.
Manzo clearly did not have such a condition that would have rendered him uninsurable. See Greene v. United Mutual Life Insurance Co., 38 Misc.2d 728, 238 N.Y.S.2d 809 (S.Ct. 1963). The testimony hardly warrants the conclusion that Manzo was uninsurable and would not have been insured by Massachusetts Mutual.[14] In light of the record it can not be said that the statement with respect to diabetes "materially affected" the acceptance of the risk in this case. At most it affected the potential amount of the premium to be charged.
Nothing herein is intended to preclude the insurer from now being entitled to the annual premium it would have charged Manzo for issuance of the policy. There is no doubt that the question did not affect the particular "hazard assumed by the insurer" in this case because the death had nothing to do with diabetes. That Manzo did not die from diabetes does not necessarily mean Massachusetts Mutual is in all respects foreclosed from reconsidering the premium charge. Berger v. *296 Minnesota Mutual Life Insurance Co., supra (723 P.2d at 391). Earlier cases on the issue of "the acceptance of the risk or the hazard assumed" were Metropolitan Life Insurance Co. v. Alvarez, 133 N.J. Eq. 65, 66-67 (Ch. 1943); and Metropolitan Life Insurance Co. v. Coddington, 131 N.J. Eq. 430, 436-437 (Ch. 1942). Aside from the fact that these cases are not binding on us, in the context of a loss totally unrelated to any misstatement the results seem rather harsh, particularly in a circumstance where the policy would have still been issued even if the true facts had been known at the time of issuance. In our view, the harshness of the earlier law needs some modification. Hence, we hold that rescission of an insurance policy by a court with equitable powers is not required where it is clear that the insurer would have issued the policy in any event, notwithstanding the false statements.
We conclude, therefore, under these circumstances that as a matter of law Massachusetts Mutual has not established that Manzo's misrepresentations were material "to the acceptance of the risk or the hazard assumed." N.J.S.A. 17B:24-3d.
Accordingly, the judgment of the Chancery Division is reversed with instructions to enter judgment in favor of defendants, subject however, to payment of the full premium for the first year, based upon an amount equal to 250% greater than the basic premium, plus interest.
LANDAU, J.A.D., dissenting.
In our earlier opinion in this case, Massachusetts Mut. Life Ins. Co. v. Manzo, 214 N.J. Super. 385, 390 (App.Div. 1986), we noted that Manzo's signature on the application for a $500,000 life insurance policy was preceded by the statement "to the best of my knowledge and belief all answers and statements are full, complete and true and were correctly recorded before I signed my name below." The majority opinion further recognizes that the record supports the finding made by the trial judge that Manzo knew and believed at the time he signed the application that he had diabetes. Based upon these findings, and the fact that Manzo checked "no" to an objective question on this issue, *297 and based upon the evidence that knowledge of Manzo's diabetic condition would have caused Massachusetts Mutual to estimate the risk differently and to set a premium two and one half times that charged to Manzo, I would affirm.
I believe that the determination of the trial judge is fully supported by our opinion in Formosa v. Equitable Life Assurance Society, 166 N.J. Super. 8 (App.Div. 1979), certif. den. 81 N.J. 53 (1979). Formosa interpreted N.J.S.A. 17B:24-3(d) as constituting a basis for equitable fraud and recision in a similar factual setting where, as here, the insured died of causes unrelated to his material misrepresentation. Formosa's interpretation of the legislative language "unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer," N.J.S.A. 17B:24-3(d), has presumably been known to and accepted by the Legislature for ten years. Judicial construction of a statute which is supported by long acquiescence on the part of the Legislature, or by continued use of the same language or failure to amend the statute, while not dispositive, is evidence that the construction is in accord with the legislative intent. Quaremba v. Allan, 67 N.J. 1, 14 (1975); Lemke v. Bailey, 41 N.J. 295, 301 (1963); compare White v. Township of North Bergen, 77 N.J. 538, 556 (1978). There have been a number of amendments to the Life and Health Insurance Code since Formosa was decided, without change in the language there interpreted. This adds to the persuasive effect of such legislative inaction. Lemke, 41 N.J. at 301.
I respectfully disagree with my colleagues that omission of the phrase "or in fixing the rate of premium" in legislation enacted since Kerpchak v. John Hancock Mut. Life Ins. Co., 97 N.J.L. 196 (E. & A. 1922) detracts from the authority of Kerpchak or Formosa. Moreover, contrary to the statement in the majority opinion, Kerpchak did not regard "every misstatement or omission as material." Rather, it regarded an untrue or wrongfully suppressed fact as material to the risk, if the knowledge or ignorance of it would naturally and reasonably *298 influence the judgment of the underwriter in making the contract, or in estimating the degree and character of the risk, or in fixing the rate of premium.
In Manzo's case, the proofs clearly support a determination that the degree and character of the risk accepted by the insurer were materially higher than disclosed by his application and medical submission.
The majority would reject Formosa and require that a misrepresentation be related to the actual cause of death in order to be deemed material. I believe that this holding reads into the statute a policy determination neither expressly nor impliedly contained in its words or the context of the surrounding statutes. The language of our earlier opinion in this very matter is most apt: "It is not the court's function to legislate, but rather to give effect to the Legislature's enactments." Manzo, 214 N.J. Super. at 389.
Moreover, the policy approach embodied in N.J.S.A. 17B:24-3(d), and interpreted by Formosa, should not hastily be judged to be harsh. It must be remembered that the legislative scheme also embodies an equitable balance provided by the two-year limit on contestability mandated in N.J.S.A. 17B:25-4.
For the above reasons, I must respectfully dissent.
NOTES
[1] Plaintiff's attorneys submitted some 41 pages containing 224 proposed findings of facts, accompanied by a lengthy submission of proposed conclusions of law. The judge adopted all of those proposed findings virtually without comment and by reference. While we do not doubt that the judge reviewed all of the proposed findings, and although we recognize the usefulness, particularly in complex cases, of the submission of proposed findings and conclusions, we have cautioned on the need for a discriminating review of the facts. In Vartenissian v. Food Haulers, Inc., 193 N.J. Super. 603, 611-612 (App.Div. 1984), we concluded that although it was not fatal to a new trial motion where the judge had adopted findings submitted by one of the parties, the better practice is for the judge to make his own statement of facts. The judge may certainly be aided by the proposed findings, but there should be some indication of a discriminating review. We are not dealing here with a new trial motion, but with the findings to support the court's judgment.
[2] Generally speaking the term "uncontrolled diabetes" means that the individual is not taking medication regularly. See Golden v. Northwestern Mutual Life Insurance Company, 229 N.J. Super. 405, 420, n. 10 (App.Div. 1988).
[3] According to Behan the following rating chart was applicable in Manzo's case:

 Rating Percentage
 Rating Debits for Issue Purposes
 Up to 15 Standard
 A 20 - 35 25
 B 40 - 60 50
 C 65 - 85 75
 D 90 - 120 100
 E 125 - 170 150
 F 175 - 220 200
 G 225 - 270 250
 H 275 - 300 300

[4] Applying that factor to the basic policy premium would result in an annual premium of $3,972.50 for the basic policy.
[5] Glycosuria is defined as the presence of sugar in the urine. Taber's Cyclopedic Medical Dictionary, G-35 (12 ed. 1973).
[6] N.J.S.A. 17B:25-4 mandates a provision in all death or accident policies providing for incontestability after two years of the date of issuance in the following terms:

There shall be a provision that the policy (exclusive of provisions of the policy or any contract supplemental thereto relating to disability benefits or to additional benefits in event of death by accident or accidental means or in event of dismemberment or loss of sight) shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue.
The policy issued by Massachusetts Mutual to Manzo contained the following provision relating to contestability:
We must bring any legal action to contest the validity of this policy within two years from its Issue Date. After that we cannot contest its validity except for failure to pay premiums.
[7] There is a general lack of an adequate definition of materiality which permeates the case law authority discussing life insurance cases. "Material" is defined as "having real importance or greater consequences," although in a sense it is related to "relevant." Webster's Ninth New Collegiate Dictionary, 733 (1988). For something to be material, in the sense of importance to the issue, it must also be relevant. The converse is not always true. Black's Law Dictionary, 880 (5th ed. 1979) defines "material" as:

Important; more or less necessary; having influence or effect; going to the merits; having to do with matter, as distinguished from form. Representation relating to matter which is so substantial and important as to influence party to whom made is `material.'
[8] N.J.S.A. 17B:24-3(d), as enacted by L. 1971, c. 144, p. 451, quoted above, does not include the phrase "or in fixing the rate of premium." The statute was derived from L. 1951, c. 237, § 5, p. 850 (formerly N.J.S.A. 17:38-13.4) and L. 1968, c. 318, § 3 (formerly N.J.S.A. 17:35B-3), both now repealed. However, these statutes were all enacted after the 1922 decision in Kerpchak. Thus, we must consider the issue under the existing statute.
[9] Unlike the dissenting opinion, we find no significance to the Legislature's failure to amend N.J.S.A. 17B:24-3(d). Legislative "inaction" is at best a "`weak reed upon which to lean' and a `poor beacon' to rely on." White v. Township of North Bergen, 77 N.J. 538, 556 (1978). See Garden State Farms, Inc. v. Bay, 77 N.J. 439, 453 (1978); 2A Sutherland, Statutory Construction, § 49.10 at 407-408 (1984 Rev.).
[10] See footnote 4, supra. Although it is not clear whether various health credits would have been applied to reduce the amount of the rated premium it is clear that with the knowledge of Manzo's diabetes a waiver of premium benefit would not have been issued.
[11] We bear in mind that we are essentially dealing only with the two year period after issuance of the policy not exempted by the incontestability statute, N.J.S.A. 17B:25-4.
[12] Berger had been diagnosed in 1974 as "afflicted with mild diabetes mellitus" which was controllable by medication. In April 1979 Berger obtained "group credit life insurance from Minnesota Mutual to satisfy his home mortgage in the event of his death." 723 P.2d at 389. He was hospitalized in February 1981 to bring his diabetes under control. A few weeks after his release from the hospital, and within two years of the issuance of the policy, he died on March 8, 1981 of an acute codeine overdose. Ibid.
[13] The D.C. code provided:

The falsity of a statement in the application for any policy of insurance shall not bar the right to recovery thereunder unless such false statement was made with intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the company. [Prudential Insurance v. Saxe, supra (134 F.2d at 24) (emphasis supplied), see also Haubner v. Aetna Life Insurance Co., supra (256 A.2d at 416).]
[14] As we noted in Golden v. Northwestern Mutual Life Insurance Company, 229 N.J. Super. 405, 421 (App.Div. 1988): "The assertion by [the insurer] after the insured's death that it would have [rejected the policy application] is, of course, easily made, but it is for the jury to determine whether that determination would actually have been made at the time of the issuance of the policy." See also Johnson v. Metropolitan Life Ins. Co., supra (53 N.J. at 434).